**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**MIDLAND-ODESSA DIVISION**

| | | |
|---|---|---|
| **Malikie Innovations Ltd. and Key Patent Innovations Ltd.** | § | |
| | § | |
| **Plaintiffs,** | § | |
| **v.** | § | **CIVIL ACTION NO. 7:26-cv-00372** |
| | § | |
| **ViaBTC Technology Limited,** | § | **JURY TRIAL DEMANDED** |
| | § | |
| **Defendant.** | § | |

**COMPLAINT FOR PATENT INFRINGEMENT AND JURY DEMAND**

Plaintiffs Malikie Innovations Ltd. ("Malikie") and Key Patent Innovations Ltd. ("KPI") (collectively, "Plaintiffs"), by and through their undersigned counsel, bring this Complaint for patent infringement and damages against Defendant ViaBTC Technology Limited ("ViaBTC" or "Defendant") and, in support, allege the following:

**PARTIES**

1. Plaintiff Malikie is the successor-in-interest to a substantial patent portfolio created and procured over many years by Blackberry Ltd., formerly known as Research in Motion Ltd., and its predecessor, subsidiary, and affiliated companies (collectively, "Blackberry"). Malikie is an Irish entity duly organized and existing under the laws of Ireland. Malikie has registered offices at: The Glasshouses GH2, 92 Georges Street Lower, Dun Laoghaire, Dublin A96 VR66, Ireland.

2. Plaintiff KPI is the beneficiary of a trust pursuant to which Malikie owns, holds, and asserts the Asserted Patents (set forth below). KPI is an Irish entity duly organized and existing under the laws of Ireland. KPI has registered offices at: The Glasshouses GH2, 92 Georges Street Lower, Dun Laoghaire, Dublin A96 VR66, Ireland.

3. On information and belief, Defendant ViaBTC Technology Limited ("ViaBTC") is a Hong Kong corporation, with a principal place of business at: Room 3A, 12/F, Kaiser Center, 18 Centre Street, Sai Ying Pun, Hong Kong. On information and belief, ViaBTC owns and operates the ViaBTC bitcoin mining pool and the website located at https://www.viabtc.com/,[1] and publishes the "ViaBTC — Crypto Mining Pool" mobile application.

## NATURE OF THE ACTION

4. This is a civil action for patent infringement under the patent laws of the United States, 35 U.S.C. § 1 *et seq*.

5. This case centers on ground-breaking innovations in elliptic curve cryptography that were discovered by some of the field's leading technologists at Certicom Corporation and Blackberry Limited (formerly known as Research In Motion, or "RIM"), that years later were recognized and selected by the designers of Bitcoin[2]—far and away the world's most valuable cryptocurrency—to enable Bitcoin's characteristic quality as a "trustless" payment system requiring no third party intermediary. Specifically, the Bitcoin protocol incorporates cryptographic technology developed and patented by Certicom and Blackberry—technology covered by the Asserted Patents. Defendant, in turn, uses this patented technology to operate one of the largest bitcoin mining operations in the world, manage its proceeds, and engage in bitcoin transactions.

6. Malikie is the assignee of and owns all right and title to U.S. Patent Nos. 8,788,827 (the "'827 Patent"); 8,806,197 (the "'197 Patent"); 8,532,286 (the "'286 Patent"); 8,712,039 (the "'039 Patent"); and 8,694,769 (the "'769 Patent") (collectively, the "Asserted Patents"), which

[1] All URLs cited in this Complaint were last accessed on July 15, 2026, unless otherwise noted.

[2] As used herein, "Bitcoin" with a capital "B" refers to Bitcoin's protocol, network, and blockchain, whereas "bitcoin" with a lower case "b" refers to the unit of cryptocurrency.

were duly and legally issued by the United States Patent and Trademark Office ("USPTO"). Malikie seeks monetary damages and, where appropriate, injunctive relief.

## FACTS COMMON TO ALL CLAIMS

### Background

#### *The Rise of Bitcoin*

7. In 2025, the price of a single bitcoin (1 BTC[3]) surpassed $126,000.[4] While that is an impressive figure in absolute terms, it is even more impressive considering how much the value of bitcoin has increased over the years. When today's leading U.S.-based cryptocurrency exchange was founded in 2012, "a bitcoin was worth $6 and only known by a few nerds on the internet."[5] Just two years prior to that, 1 BTC was worth less than a penny: $0.0041. On May 22, 2010, in what is widely understood to be the first commercial Bitcoin transaction, Laszlo Hanyecz (one of Bitcoin's earliest developers and proponents) paid 10,000 BTC—worth about $41 at the time—for two Papa John's pizzas.[6] And only seven months before that, 1 BTC was worth just $0.00099. In the first ever exchange of bitcoin for U.S. dollars, Martti Malmi (Bitcoin's second developer after Satoshi Nakamoto) sold 5,050 BTC for $5.02 on October 12, 2009.[7] Following the meteoric rise of Bitcoin, had they kept them, Hanyecz's 10,000 BTC would have been worth over $1.26

---

[3] "BTC" is a common unit used to designate one bitcoin. *See* https://bitcoin.org/en/vocabulary#btc. Bitcoin can be transacted in units smaller than 1 BTC, in units of "satoshi," which is the smallest unit of bitcoin, equivalent to a one hundred millionth of a single bitcoin (0.00000001 BTC). *See* https://en.bitcoin.it/wiki/Satoshi_(unit).

[4] https://www.coinbase.com/price/bitcoin.

[5] https://www.cnbc.com/2021/04/14/coinbase-co-founders-launched-when-a-bitcoin-btc-was-worth-6.html (quoting Fred Ehrsam, co-founder of Coinbase).

[6] https://www.youtube.com/watch?v=tWU3O3X5kKE; https://www.coinbase.com/learn/crypto-glossary/what-is-bitcoin-pizza.

[7] https://bitcoinmagazine.com/markets/bitcoins-first-trade-now-worth-130-million.

billion in October 2025 and Malmi's 5,050 BTC would have been worth over $636 million. No other cryptocurrency has attained such incredible value.

8. Bitcoin is regarded as the first "cryptocurrency" and "remains by far the biggest, most influential, and best-known."[8] Other leading cryptocurrencies today include Ethereum, Tether, and Solana, which, although they are perhaps relatively well-known among those familiar with cryptocurrency, are worth orders of magnitude less than Bitcoin.[9] Thousands of cryptocurrencies exist today[10], but, as the Ethereum website acknowledges, "[i]t all started with [b]itcoin."[11]

9. While Bitcoin is the foundation of today's sprawling cryptocurrency market, the foundation of Bitcoin's trailblazing trustless digital currency model—its digital signature framework—uses cryptographic technology developed and patented by Certicom and Blackberry.[12] Bitcoin's adoption of this technology set a trend that has propagated throughout the cryptocurrency landscape. The Bitcoin mining industry has also adopted techniques developed by Certicom for efficiently processing cryptographic hash functions—part of a process for adding Bitcoin transactions to the blockchain and minting new bitcoin known as "mining."[13] Globally,

---

[8] https://www.coinbase.com/learn/crypto-basics/what-is-cryptocurrency.

[9] *See*, *e.g.*, *id.*; https://coinmarketcap.com/.

[10] For example, the Coinbase exchange lists hundreds of tradable crypto assets among thousands in existence. https://www.coinbase.com/explore.

[11] https://web.archive.org/web/20241216232605/https://ethereum.org/en/what-is-ethereum/ (answering "What is a cryptocurrency?").

[12] https://bitcoin.org/bitcoin.pdf ("Bitcoin Whitepaper") at 1, 2, 8.

[13] https://bitcoin.org/en/vocabulary#mining.

the Bitcoin mining industry processes over one sextillion ($10^{21}$ or 1,000,000,000,000,000,000,000) cryptographic hashes every second.[14]

***Bitcoin's Foundation is Certicom-Developed Cryptography***

10. The creation of Bitcoin is attributed to Satoshi Nakamoto ("Satoshi"), the presumed pseudonym used by the author[15] of a white paper titled "Bitcoin: A Peer-to-Peer Electronic Cash System," which was reportedly sent on October 31, 2008 to a small group of recipients on "The Cryptography Mailing List" using a pipermail message service hosted by metzdowd.com.[16] Satoshi's message included a link to the white paper, which was (and still is) hosted at bitcoin.org, a site "originally registered and owned by Bitcoin's first two developers, Satoshi Nakamoto and Martti Malmi."[17]

11. The first line of Satoshi's initial message to the "cryptography" community articulated the goal of Bitcoin: to provide "a new electronic cash system that's fully peer-to-peer, with no trusted third party."[18] This defining characteristic of Bitcoin is achieved using

---

[14] https://www.coinwarz.com/mining/bitcoin/hashrate-chart; https://thebitcoinmanual.com/articles/btc-hashrate-1-zetahash/.

[15] Satoshi Nakamoto might be one or more persons. *See*, *e.g.*, https://www.metzdowd.com/pipermail/cryptography/2008-October/014810.html ("I've been working on a new electronic cash system…."); *id.* ("We propose a solution to the double-spending problem….").

[16] *See* Bitcoin Whitepaper; *see also* https://www.wired.com/story/after-10-years-bitcoin-changed-everything-nothing/.

[17] https://bitcoin.org/en/about-us#own; https://www.metzdowd.com/pipermail/cryptography/2008-October/014810.html.

[18] https://www.metzdowd.com/pipermail/cryptography/2008-October/014810.html; *see also* Bitcoin Whitepaper (abstract).

cryptography.[19] Specifically, "[d]igital signatures provide part of the solution."[20] As Satoshi explained in a February 11, 2009 message to another online community—the "p2p-research" mailing list—"[o]ne of the fundamental building blocks for such a system [as Bitcoin] is digital signatures."[21]

12. A digital signature is a cryptographic tool for verifying the authenticity of digital data (*i.e.*, validating its original source and genuineness) and its integrity (*i.e.*, that it is accurate, complete, and has not been tampered with).[22] In fact, a bitcoin is fundamentally just "a chain of digital signatures" recorded in a public history or "chain" of transactions. *See* Bitcoin Whitepaper at 2 ("We define an electronic coin as a chain of digital signatures. Each owner transfers the coin to the next by digitally signing a hash of the previous transaction and the public key of the next owner and adding these to the end of the coin."), 8 (describing "a peer-to-peer network using proof-of-work to record a public history of transactions").

---

[19] Bitcoin Whitepaper at 1 ("What is needed is an electronic payment system based on cryptographic proof instead of trust, allowing any two willing parties to transact directly with each other without the need for a trusted third party.").

[20] https://www.metzdowd.com/pipermail/cryptography/2008-October/014810.html (abstract); Bitcoin Whitepaper (abstract).

[21] https://satoshi.nakamotoinstitute.org/emails/p2p-research/35/.

[22] https://www.cisa.gov/news-events/news/understanding-digital-signatures.

**2. Transactions**

We define an electronic coin as a chain of digital signatures. Each owner transfers the coin to the next by digitally signing a hash of the previous transaction and the public key of the next owner and adding these to the end of the coin. A payee can verify the signatures to verify the chain of ownership.




Bitcoin Whitepaper at 2

*See also* https://satoshi.nakamotoinstitute.org/emails/p2p-research/35/ ("A digital coin contains the public key of its owner. To transfer it, the owner signs the coin together with the public key of the next owner. Anyone can check the signatures to verify the chain of ownership"). Specifically, as Satoshi explained to the "cryptography" community shortly after releasing the white paper but before releasing the first version of Bitcoin software, "it's ECC digital signatures."[23]

13. The acronym "ECC" stands for elliptic curve cryptography.[24] ECC "represents a different way to do public-key cryptography—an alternative to the older RSA system—and also offers certain advantages."[25] "ECC devices require less storage, less power, less memory, and less bandwidth than other systems. This allows you to implement cryptography in platforms that are constrained, such as wireless devices, handheld computers, smart cards, and thin-clients. It also

[23] https://satoshi.nakamotoinstitute.org/emails/cryptography/14/; *see also* https://satoshi.nakamotoinstitute.org/emails/cryptography/2/ (explaining that "ECC is nicely compact").

[24] https://en.bitcoin.it/wiki/Elliptic_curve_cryptography.

[25] https://www.certicom.com/content/certicom/en/the-basics-of-ecc.html.

provides a big win in situations where efficiency is important."[26] As explained by Certicom Corporation, "the authority for strong, efficient cryptography," when asymmetric cryptography (such as public-key cryptography) is desired "Elliptic curve cryptography (ECC) is the best choice, because" it "will give you the most security per bit."[27] For example, "ECC offers considerably greater security for a given key size" and enables "faster cryptographic operations, running on smaller chips or more compact software" resulting in "less heat production and less power consumption."[28]

14. ECC is also secure. In 1997, Certicom introduced the "Elliptic Curve Cryptosystem (ECC) Challenge" as a way "to increase industry understanding and appreciation for the difficulty of the elliptic curve discrete logarithm problem, and to encourage and stimulate further research in the security analysis of elliptic curve cryptosystems."[29] Certicom challenged participants to compute the ECC private key from a list of ECC public keys and associated parameters.[30] The challenge included relatively easier (Level I) challenges, some of which have been solved, and more difficult (Level II) challenges, which Certicom believed to be "computationally infeasible" and still have not been solved.[31]

15. As mentioned above, Bitcoin uses ECC digital signatures. Specifically, Bitcoin uses an elliptic curve digital signature algorithm ("ECDSA") with parameters known as

---

[26] *Id.*

[27] https://www.certicom.com/content/dam/certicom/images/pdfs/WP-ECCprimer.pdf at 3, 22.

[28] *Id.* at 3.

[29] https://www.certicom.com/content/certicom/en/the-certicom-ecc-challenge.html.

[30] *Id.*

[31] *Id.*

"secp256k1."[32] Secp256k1 is defined in a Standards for Efficient Cryptography (SEC) specification titled "SEC 2: Recommended Elliptic Curve Domain Parameters" (Version 2.0, Jan. 2010), which is a publication of the Standards for Efficient Cryptography Group (SECG).[33] The SEC 2 paper (Version 2.0) was generated by Certicom Research and identifies Dan Brown of Certicom as the main contact.[34] Dan Brown is a co-inventor of several of the Asserted Patents in this case. *See infra*.

16. Certicom—which was "[f]ounded in 1985, the same year Elliptic Curve Cryptography (ECC) was invented"—has a long been regarded as the leader in ECC technology.[35] Indeed, Scott Vanstone, who co-founded Certicom in 1985 with Gord Agnew and Ron Mullin, was an internationally recognized top ECC researcher and the recipient of prestigious awards and recognitions for his monumental and profound contributions in the field of ECC.[36] Vanstone authored numerous papers and was awarded hundreds of patents related to ECC.[37] To help drive ECC's commercial adoption, Certicom (with Vanstone) founded the SECG in 1998.[38] The purpose of the SECG is "to develop commercial standards that facilitate the adoption of efficient

[32] https://en.bitcoin.it/wiki/Elliptic_Curve_Digital_Signature_Algorithm; https://en.bitcoin.it/wiki/Secp256k1.

[33] https://www.secg.org/sec2-v2.pdf at 9.

[34] *Id.* (cover page).

[35] https://www.certicom.com/content/certicom/en/about.html.

[36] *See, e.g.*, https://www.certicom.com/content/certicom/en/about/news/release/2004/certicom-founder-scott-vanstone-wins-prestigious-research-award.html; https://www.certicom.com/content/certicom/en/about/news/release/2009/certicom-founder-wins-premiers-catalyst-award-for-lifetime-achie.html; https://uwaterloo.ca/news/profound-impact-researcher.

[37] *See id.*

[38] https://www.cnet.com/tech/tech-industry/certicom-creates-standards-body/.

cryptography and interoperability across a wide range of computing platforms."[39] "SECG members include leading technology companies and key industry players in the information security industry," including its founding member, Certicom.[40] Certicom's development of a standards body to promote ECC was welcomed by many in the cryptography industry. As the chief scientist of one security firm put it in 1998, "It's good news for the industry as a whole to move ECC forward because it is a promising technology."[41] In 2004, a professor at Texas Tech University (winner of the Certicom Elliptic Curve Cryptography (ECC)2-109 Challenge) said, "I think public-key cryptography based on ECC is what we should and will be moving toward."[42] Walt Davis, former senior vice-president at Motorola, told Vanstone that he believed "ECC was the only technology that would work in their constrained environments."[43]

17. Demonstrating its position as the leader in developing and promoting ECC technology, Certicom hosted the annual ECC Conference beginning in 2004, which "was designed to interest both a technical audience and business managers."[44] Vanstone recalled that the 2004 conference "was well-attended by cryptography experts, industry leaders and members of the developer community."[45] The conference also "held significant historical value," with "luminaries

---

[39] https://www.secg.org/.

[40] *Id.*; *see also* https://www.certicom.com/content/certicom/en/about/news/release/2005/standards-for-efficient-cryptography-group--secg--announce-new-i.html (identifying Certicom as "a founding member of SECG").

[41] https://www.cnet.com/tech/tech-industry/certicom-creates-standards-body/.

[42] https://www.metzdowd.com/pipermail/cryptography/2004-April/006798.html.

[43] https://www.certicom.com/content/certicom/en/code-and-cipher/article/529-reflections-the-year-that-was-.html.

[44] *Id.*

[45] *Id.*

such as Dr. Ralph Merkle, Dr. Neal Koblitz, Dr. Victor Miller and Dr. Walt Davis" in attendance.[46] Those luminaries were the pioneers of public key cryptography and ECC: Miller and Koblitz "independently invented elliptic curve cryptography"; Merkle was one of the inventors of public key cryptography; and Davis was a senior vice-president at Motorola who was an early advocate for ECC and recipient of the first ECC Visionary Award.[47] As a testament to Certicom's status as the unrivaled leader and authority in ECC research and development, industry members recognized Certicom as "the most commercial promoter of elliptic curve crypto."[48] Indeed, Certicom has been described as the "authority," "leader," and "expert" in the field of ECC.[49]

18. Resulting from its pioneering discoveries in ECC, Certicom is well known to have been the holder of many valuable patents covering certain implementations of ECC. For example, Bruce Schneier[50], an internationally renowned security technologist (known as the "security guru") and Adjunct Lecturer in Public Policy at the Harvard Kennedy School, once said that "Certicom certainly can claim ownership of ECC," noting that "[t]he algorithm was developed and patented by the company's founders, and the patents are well written and strong."[51] Certicom claimed to

---

[46] *Id.*

[47] *Id.*

[48] https://www.cnet.com/tech/tech-industry/certicom-creates-standards-body/.

[49] *See, e.g.*, https://www.metzdowd.com/pipermail/cryptography/2004-April/006798.html; https://news.profoundimpact.com/tag/dr-scott-vanstone/; https://cpl.thalesgroup.com/partners/rim-certicom.

[50] *See* https://web.archive.org/web/20250513035631/https://www.hks.harvard.edu/faculty/bruce-schneier; https://www.belfercenter.org/person/bruce-schneier.

[51] https://betanews.com/2007/05/30/certicom-patent-suit-against-sony-threatens-to-unravel-aacs/.

have had "the world's largest intellectual property portfolio for these types of [ECC] patents."[52] After acquiring Certicom, BlackBerry grew that portfolio to over 500 ECC patents.[53]

19. Satoshi chose Certicom's secp256k1 curve for Bitcoin's digital signature algorithm.[54] According to the Bitcoin wiki site, "secp256k1 was almost never used before Bitcoin became popular."[55] As one commentator said, "If it wasn't for Satoshi Nakamoto, you probably would never have heard of the secp256k1 Elliptic Curve Cryptography (ECC) method."[56] Even Dan Brown was surprised to learn that Bitcoin uses secp256k1 instead of other, more commonly used parameters.[57] Some suggest that Satoshi, having not received a recommendation for a specific curve, just "picked one."[58] Others suggest that Satoshi relied on expert cryptographers in selecting secp256k1.[59]

20. Whatever the reason, Satoshi's choice of secp256k1 has proven to be well-liked by the Bitcoin community and the broader cryptocurrency community. The Bitcoin wiki site reports that after Bitcoin's adoption of secp256k1, the curve "is now gaining in popularity due to its several

---

[52] https://www.certicom.com/content/certicom/en/about/news/release/2007/certicom-announces-executive-changes.html.

[53] https://blackberry.certicom.com/en.

[54] *See*, *e.g.*, https://news.ycombinator.com/item?id=28813291.

[55] https://en.bitcoin.it/wiki/Secp256k1.

[56] https://medium.com/asecuritysite-when-bob-met-alice/the-bluffers-guide-to-secp256k1-when-satoshi-said-goodbye-to-pki-bad327c4f079.

[57] https://bitcoinmagazine.com/technical/satoshis-genius-unexpected-ways-in-which-bitcoin-dodged-some-cryptographic-bullet-1382996984 (quoting Brown as saying "I did not know that BitCoin is using secp256k1. Indeed, I am surprised to see anybody use secp256k1 instead of secp256r1.").

[58] https://learnmeabitcoin.com/technical/cryptography/elliptic-curve/ (quoting email between Satoshi and Mike Hearn, a "Bitcoin developer" who published his emails with Satoshi).

[59] https://cointelegraph.com/news/satoshi-nakamoto-had-outside-cryptography-help-says-early-bitcoin-dev (citing Laszlo Hanyecz's account of his conversations with Satoshi).

nice properties."[60] Gregory Maxwell, a former Bitcoin developer, said in a public forum in October 2021 that Satoshi's choice of secp256k1 "was a good choice at the time, esp[ecially] now after the expiration of the GLV patent."[61] "The GLV patent" refers to another groundbreaking innovation by Certicom's in-house experts in elliptic curve cryptography, famously known as "GLV Endomorphism,"[62] which the Bitcoin community had been stalking for a decade or more after Hal Finney, foundational Bitcoin developer (and receiver of the first ever Bitcoin transaction), discovered in early 2011 that it can be used to speed up signature verifications by 25%.[63]

21. Finney, a well-known and highly respected cryptographer, posted on February 8, 2011 that he figured out a way to speed up ECDSA signature verification for the secp256k1 curve used by Bitcoin, based on techniques described in "Guide to Elliptic Curve Cryptography" by Hankerson, Menezes and Vanstone.[64] The "Vanstone" of the book's authoring trio is Scott Vanstone, co-founder of Certicom and co-inventor of several of the Asserted Patents in this case. The technique that Finney's post referred to is famously known among the Bitcoin community and elsewhere as "GLV Endomorphism" or the "GLV method," where "GLV" refers to the trio of Certicom innovators that came up with it: Robert Gallant, Robert Lambert, and Scott Vanstone.[65] All three were Certicom technologists and are co-inventors of several of the Asserted Patents in this case. It is widely reported that Finney's proposed inclusion of GLV Endomorphism in the Bitcoin protocol, though it was eventually included in the Bitcoin Core software library named

---

[60] https://en.bitcoin.it/wiki/Secp256k1.

[61] https://news.ycombinator.com/item?id=28813291.

[62] The Asserted Patents' inventions are independent from and not described in the GLV patent.

[63] https://btctimes.com/hal-finneys-proposal-for-optimizing-bitcoin-to-be-enabled-in-bitcoin-core/.

[64] *Id.*; *see also* https://web.archive.org/web/20241203093903/https:/cointelegraph.com/news/one-of-hal-finney-s-lost-contributions-to-bitcoin-core-to-be-resurrected.

[65] *See id.*

libscep256k1, was not officially implemented at the time because of concerns that it would infringe "the GLV patent," *i.e.*, U.S. Patent No. 7,110,538, which names Gallant, Lambert, and Vanstone as the inventors.[66] On the day the GLV patent expired, and over the days that followed, the Bitcoin community celebrated the anticipated inclusion of GLV Endomorphism in future Bitcoin Core releases.[67] In fact, on the day the GLV patent expired, the Bitcoin Core community began the process of deleting the "slower non-endomorphism code" and replacing it with the faster "GLV optimization," including by deleting the code that previously made GLV endomorphism optional, thereby enabling GLV Endomorphism by default.[68] Others in the Bitcoin community later confirmed Finney's observations that GLV Endomorphism results in significantly faster signature verifications (reportedly by 28%).[69] Following Bitcoin's lead, others in the crypto community followed suit in adopting GLV Endomorphism optimizations.[70]

22. While some people like Finney, Malmi, and Hearn are known as early Bitcoin developers, Satoshi Nakamoto is credited with creating the first Bitcoin client, *i.e.*, the first software implementing the Bitcoin protocol.[71] Satoshi announced the release of the first version of Bitcoin software to the "cryptography" community on January 8, 2009.[72] Satoshi's original Bitcoin software is the foundation of today's *de facto* authoritative reference implementation of

---

[66] *See id.*

[67] *See id.*

[68] https://github.com/bitcoin-core/secp256k1/pull/826 ("As the patent on the GLV optimization has expired, there is no need to keep the slower non-endomorphism code around anymore.").

[69] https://btctimes.com/bitcoin-upgrade-glv-enomorphism-tests-show-faster-verification/.

[70] *See* https://github.com/RustCrypto/elliptic-curves/issues/211 ("bitcoin-core/secp256k1 is now switching to the endomorphism implementation by default: bitcoin-core/secp256k1#826 I think it would make sense for us to do the same.").

[71] https://en.bitcoin.it/wiki/Satoshi_Nakamoto.

[72] https://satoshi.nakamotoinstitute.org/emails/cryptography/16/.

the Bitcoin protocol, known as "Bitcoin Core."[73] Bitcoin Core continues to implement ECC digital signatures using ECDSA with secp256k1.[74]

23. The public history of Bitcoin's development discussed above shows the impact that Certicom's innovations had on the shaping of Bitcoin and is a testament to the bona fides of Certicom's innovators as significant contributors to the advancement of important and valuable ECC technology.

24. The Bitcoin industry's use of Certicom innovations did not stop with digital signatures. The Bitcoin industry widely relies on patented Certicom innovations to efficiently hash new blocks to add them to the blockchain and "mine" new bitcoin. Bitcoin transactions are validated and added to the blockchain through this "mining" process, whereby transactions are added to blocks and operators of specialized mining computers race to solve a cryptographic puzzle that allows a next block to be added to the blockchain, entitling the winner to collect a "block reward."[75] This process is computationally intensive, thereby making it very difficult to tamper with the blockchain (*e.g.*, to modify or rewrite past transactions).[76] The computational intensity comes from a need to repeatedly perform a cryptographic hash function to discover a hash value that satisfies certain criteria, which some mining entities perform at the rate of "exahashes" per

---

[73] https://en.bitcoin.it/wiki/Bitcoin_Core (Bitcoin Core is "based on the original reference code by Satoshi Nakamoto"); https://bitcoincore.org/en/about/ ("[Bitcoin Core] is a direct descendant of the original Bitcoin software client released by Satoshi Nakamoto after he published the famous Bitcoin whitepaper.").

[74] https://en.bitcoin.it/wiki/Elliptic_Curve_Digital_Signature_Algorithm; https://en.bitcoin.it/wiki/Secp256k1.

[75] https://www.coinbase.com/learn/crypto-basics/how-do-cryptocurrency-miners-work; Bitcoin Whitepaper at 3 ("Proof-of-Work"), 4 ("Incentive"), 6-8 ("Calculations"); https://en.bitcoin.it/wiki/Block; https://en.bitcoin.it/wiki/Controlled_supply.

[76] Bitcoin Whitepaper at 3 ("Proof-of-Work"), 6-8 ("Calculations").

second (EH/s), *i.e.*, quintillions of hashes per second.[77] To do this, the Bitcoin industry relies on specialized mining computers containing application-specific integrated circuits ("ASICs") that are designed specifically (and typically, solely) for processing the SHA-256 hash function (a type of SHA-2 hash function) used by the Bitcoin network.[78] Before the advent of ASIC mining, Certicom invented techniques for processing SHA-2 hash functions faster and more efficiently.

25. On information and belief, several commonly used mining machines, including models made by Bitmain—a top manufacturer of bitcoin miners[79]—utilize the improved hash processing techniques developed and patented by Certicom.

***Blackberry Acquired Certicom Following Years-Long Alliance***

26. Blackberry was an early adopter of Certicom's ECC technology. In July 2000, in recognition of "Certicom's high performance, efficient ECC," Blackberry and Certicom entered into "an alliance which will enable RIM to utilize Certicom's elliptic curve cryptography (ECC) technology throughout its wireless product offerings."[80] Blackberry recognized that "Certicom's Elliptic Curve Cryptography (ECC) technology enables strong, high performance security for many pieces of the computing infrastructure," and that "Certicom's patented implementation of ECC technology provides a more efficient alternative to conventional public key cryptographic algorithms … allowing for faster processing speed, reduced bandwidth usage and decreased battery requirements."[81] Accordingly, BlackBerry entered into an "agreement with Certicom, a

---

[77] https://www.pcmag.com/encyclopedia/term/exahash.

[78] https://en.bitcoin.it/wiki/ASIC.

[79] https://www.bitmain.com/about; https://www.cryptominerbros.com/blog/most-profitable-bitcoin-mining-machines/.

[80] https://www.certicom.com/content/certicom/en/about/news/release/2000/research-in-motion-and-certicom-to-enable-trusted-mobile-commerc.html.

[81] *Id.*

leader in ECC wireless security technology, [to] enable [BlackBerry] to provide the market with the secure mobile devices they require for m-commerce transactions."[82]

27. In 2009, BlackBerry acquired Certicom, giving rise to BlackBerry Certicom, "the leader in applied cryptography and key management."[83] Certicom's industry-leading research and development continued under BlackBerry Certicom; together BlackBerry and Certicom continued innovating and improving ECC technology. As a result of its rich history in ECC technology development, "BlackBerry Certicom has industry leading expertise in Elliptic Curve Cryptography and has established the world's largest ECC-based patent portfolio."[84] Plaintiff Malikie now owns part of that portfolio, including the Asserted Patents.

***Cryptocurrency Basics***

28. Bitcoin paved the way for the thousands of cryptocurrencies that exist today. The term "cryptocurrency," or "crypto" for short, refers to a category of "digital money" that, like the fundamental purpose of Bitcoin, "makes it possible to transfer value online without the need for a middleman like a bank or payment processor."[85] Most cryptocurrencies, including Bitcoin, are decentralized (not managed or controlled by a government or other central authority), not backed by anything of independent value (such as gold), and not guaranteed by anyone (such as a government or bank). Instead, cryptocurrencies are managed by "peer-to-peer networks of computers running free, open-source software."[86] Specifically, cryptocurrency transactions are vetted and recorded using a technology called "blockchain," which is a decentralized database

---

[82] *Id.*

[83] https://www.certicom.com/content/certicom/en/about.html.

[84] *Id.*; *see* https://blackberry.certicom.com/en.

[85] https://www.coinbase.com/learn/crypto-basics/what-is-cryptocurrency.

[86] *Id.*

system that stores data in a distributed network of computers. This is in some ways analogous to the ledger of accounts and transactions maintained by a traditional financial intermediary (such as a bank or credit card company). However, unlike with a traditional intermediary where the security of transactions and accounts is vested solely in the intermediary (which requires its customers to trust the intermediary with their money), the security of blockchain transactions is effected by the use of cryptography and "consensus" mechanisms to ensure that a majority of the computers on the network agree that a transaction is valid before it is recorded (*i.e.*, deemed to have occurred).[87]

29. As the name suggests, cryptocurrencies fundamentally rely on concepts from cryptography and computer science to enable the creation of such decentralized, internet-based monetary systems that are secure. Indeed, as stated on the Ethereum website, the world's second most popular cryptocurrency, "[t]he reason assets such as bitcoin and ether are called 'cryptocurrencies' is that the security of your data and assets is guaranteed by cryptography, not by trusting an institution or corporation to act honestly."[88] Cryptocurrencies rely on cryptography (hence the name *crypto*currency) to protect participants' assets from theft and to protect the cryptocurrency system from dishonest or unauthorized manipulation that results in dilution of the currency (*e.g.*, double spending).[89] More fundamentally, cryptography is what enables cryptocurrencies like Bitcoin to be "trustless," *i.e.*, what allows cryptocurrency to be transacted securely (even between strangers) without the need for a trusted intermediary to verify and process payments.[90]

---

[87] *Id.*

[88] https://web.archive.org/web/20241216232605/https://ethereum.org/en/what-is-ethereum/ (answering "What is a cryptocurrency?"); *see also* https://www.coinbase.com/learn/crypto-basics/what-is-cryptography ("Cryptocurrencies are entirely based on cryptographic ideas.").

[89] *See* https://www.coinbase.com/learn/crypto-basics/what-is-cryptography.

[90] *See id.*

### *Transactions*

30. The role of cryptography as a fundamentally enabling technology in cryptocurrencies like Bitcoin is evident in how cryptocurrency transactions are processed, *i.e.*, initiated, validated, and recorded in the blockchain. Unlike with typical currencies, where transactions transfer an amount of currency from one account to another that is redeemable in physical notes and coins, "cryptocurrency transactions are simply data entries recorded on an unchangeable, distributed ledger, referred to as a blockchain."[91] That is, with cryptocurrencies, "no cryptocurrency is actually exchanged between people. Instead, ownership data associated with both parties' crypto wallets is updated on the blockchain each time a transaction is processed."[92]

31. A cryptocurrency transaction—transferring crypto from the sender's digital wallet to the receiver's digital wallet—involves several steps. Using wallet software, a transaction (essentially, a bundle of data) is created that identifies the sender's address (using a public key), the recipient's address (also using a public key), and the amount of cryptocurrency to be sent.[93] The transaction requestor then creates a digital signature for the transaction with its private key and public key (which are cryptographically linked, as the private key is used to create the public key) and submits the signed transaction to the blockchain network for validation. By signing the transaction with its private key, the requestor proves to the receiving party and to the blockchain network that the transaction is valid. After the receiving party validates the transaction using the sender's public key, the transaction is broadcast to and propagated through the blockchain network, where a majority network nodes must independently verify that the transaction is valid in order for

---

[91] https://www.kraken.com/learn/how-do-cryptocurrency-transactions-work.

[92] *Id.*

[93] *Id.*

the transaction to be added to the next "block" of the blockchain and thus be permanently and irreversibly recorded.[94]

***Wallets***

32. A cryptocurrency "wallet" is a tool for interacting with a Blockchain network that allows a user to send and receive cryptocurrencies like Bitcoin.[95] A wallet is typically an application (software) that functions as a wallet for storing the user's private keys and provides interfaces to access and perform transactions with the user's cryptocurrency. Wallets can be custodial (keys are managed by a third party) or non-custodial (keys are managed solely by the user). Forms of hardware wallets also exist (*e.g.*, a USB drive wallet). Crypto wallets don't store the actual cryptocurrency (because the cryptocurrency exists as data in the blockchain) but instead store the public and private keys needed to carry out crypto transactions on the blockchain.[96]

***Private Keys and Public Keys***

33. Private keys and public keys are related but different pieces of information used in cryptocurrency transactions. They are part of a technique known as asymmetric cryptography, in which two keys are used: (1) a private key (possessed by only the entity wishing to prove its identity) and (2) a public key (possessed by any number of entities who wishes to verify the identity of the entity possessing the private key).[97] Unlike the alternative approach known as symmetric cryptography—in which a single key is used by both (or all) parties for their respective purposes, thereby preventing the key from being associated with a unique identity—asymmetric cryptography simplifies key exchange by reducing the number of keys needed to secure messages

---

[94] *See id.*

[95] https://www.investopedia.com/terms/b/bitcoin-wallet.asp.

[96] *See id.*

[97] https://www.certicom.com/content/dam/certicom/images/pdfs/WP-ECCprimer.pdf ("ECC Primer") at 4.

between parties and allows a message signature to be uniquely authenticated (*i.e.*, associated with the unique identity of the sender).[98]



**SYMMETRIC**
Symmetric cryptography has an equation of $\frac{n(n-1)}{2}$ for the number of keys needed. In a situation with 1000 users, that would mean **499,500 keys**.

**ASYMMETRIC**
Asymmetric cryptography, using key pairs for each of its users, has *n* as the number of key pairs needed. In a situation with 1000 users, that would mean **1000 key pairs**.

ECC Primer at 5

34. Importantly, while the public key can be used by an entity to verify that another possesses the corresponding private key, "you cannot derive the private key from the public. This is the critical feature of asymmetric cryptographic schemes that makes them so useful." ECC Primer at 4; *see also id.* ("The critical feature of asymmetric cryptography, that makes it useful, is this key pair—and more specifically, a particular feature of the key pair: the fact that one of the keys cannot be obtained from the other."). It is also "the core technology behind digital signatures." *Id.* "A digital signature is a transform performed on a message using the private key, whose integrity may be verified with the public key." *Id.* at 5.

[98] *Id.* at 4–5.




ECC Primer at 5

Elliptic curve cryptography (ECC) is an approach to doing asymmetric cryptography, including for use with digital signatures. *Id.*

35. Private and public keys form a related key-pair—a public key is generated from a private key through a one-way hash function (or "trapdoor function") that is relatively easy to solve in one direction but nearly impossible to solve in the other direction, making it nearly impossible to determine a private key from a public key.[99] *See also* ECC Primer at 6-7 ("In all asymmetric cryptographic schemes, this property—the property that one key is used for encryption, and another for decryption, and the decryption key cannot be found from the encryption key—is derived from the use of mathematical functions whose inverse is extremely difficult to calculate. You may understand an asymmetric cryptographic key pair as a pair of numbers which have some relationship associated with a mathematical function which is relatively easy to compute in one direction, but whose inverse is in practical terms intractable. This feature—the function which is tractable in one direction, but intractable in the other, is common to all asymmetric cryptosystems, including ECC."). This characteristic of asymmetric cryptography allows the sender of cryptocurrency to digitally sign a transaction using their unique and secret private key as proof of ownership, and it allows the recipient and blockchain nodes to verify the digital signature and validate the transaction using the sender's public key. Accordingly, in cryptocurrency transactions, public keys are used to identify the sending and receiving addresses

[99] https://www.ledger.com/academy/blockchain/what-are-public-keys-and-private-keys.

(akin to account numbers in a bank), and private keys are used to sign transactions when sending cryptocurrency to others (which can be verified by the receiver and the blockchain network using the sender's public key).[100]

***Blockchain***

36. Cryptocurrencies like Bitcoin are based on a technology called "blockchain."[101] A blockchain is essentially a distributed database that, in a cryptocurrency network like Bitcoin, contains a list or "ledger" of all historical transactions on the network (*i.e.*, a record of every time anyone sent or received bitcoin). The blockchain of a cryptocurrency like Bitcoin is in some ways akin to the ledger or balance sheet of a bank.

37. A blockchain network includes a number of distributed computers (called "nodes") that store a copy of the blockchain ledger and participate in the verification and recording of each transaction.[102] To become part of the blockchain ledger, a transaction must be transmitted to the network of nodes, which work to confirm the validity of the transaction using cryptographic algorithms. Valid transactions are collected into a fixed-size data file called a "block" (akin to a page of a ledger) that, once filled, is run through a cryptographic hash function (that is, the block is "hashed") to generate a unique hash value for that block. That block's hash value is included within the next block that is created so that when the next block is hashed, its hash value depends on the hash of the previous block, thereby creating an irreversible "chain" of blocks (hence the name "blockchain") as the process continues.[103] *See also* Bitcoin Whitepaper at 2–5.

---

[100] *See id.*

[101] *See* https://www.investopedia.com/terms/b/blockchain.asp.

[102] *See id.*

[103] *See id.*




Bitcoin Whitepaper at 3




Bitcoin Whitepaper at 5

38. The Bitcoin blockchain creates a chronological ledger of chained transactions where each new block depends on the information from all previous blocks, thereby making it nearly impossible to undo or manipulate historical transactions without permission.[104] *See also* Bitcoin Whitepaper at 3 ("Once the CPU effort has been expended to make it satisfy the proof-of-work, the block cannot be changed without redoing the work. As later blocks are chained after it, the work to change the block would include redoing all the blocks after it."), *id.* ("To modify a past block, an attacker would have to redo the proof-of-work of the block and all blocks after it and then catch up with and surpass the work of the honest nodes. We will show later that the probability of a slower attacker catching up diminishes exponentially as subsequent blocks are added.").

[104] *See id.*

***Bitcoin's Consensus Mechanism: Proof of Work ("Mining")***

39. "'Proof of work' and 'proof of stake' are the two major consensus mechanisms cryptocurrencies use to verify new transactions, add them to the blockchain, and create new tokens."[105] "Proof of work, first pioneered by Bitcoin, uses mining to achieve those goals."[106] In a proof of work blockchain, members of the network ("miners") race against each other to be the first to solve a complex cryptographic math problem for determining a hash value associated with a particular block of transactions and present their solution to the network.[107] If the miner's solution is verified by the network, the miner is allowed to create a new block (containing the transactions verified by the miner) and broadcast it to the network. The nodes on the network will then perform audits of the ledger and the new block, and if the auditing nodes agree, the new block is "chained" to the previous block (creating a chronological chain of transactions) and the miner is rewarded with a unit of "coin" (*i.e.*, cryptocurrency), consisting of a mining fee for solving the block, as well as transaction fees for processing the underlying transactions, as compensation for expending their resources (*e.g.*, energy) in the performance of this work. As the block chain grows, mining the next block to receive its reward becomes more computationally expensive (and therefore more resource intensive). Accordingly, the proof-of-work consensus model is more rewarding for those with more resources to deploy.[108]

***Hashing***

40. Part of the mining process includes repeatedly performing a cryptographic hash function to discover a hash value that solves the block puzzle. To do this, miners hash a group of

---

[105] https://www.coinbase.com/learn/crypto-basics/what-is-proof-of-work-or-proof-of-stake.
[106] *Id.*
[107] *See id.*; Bitcoin Whitepaper at 3–4; https://www.investopedia.com/terms/b/blockchain.asp.
[108] *See id.*

data fields included at the beginning of a candidate block called the "block header," which includes a special field called the "nonce,"[109] and compare the resulting hash value to criteria specified by the Bitcoin network. If the hash value meets the criteria, the solution is valid and may be submitted to the network in exchange for a block reward. If the hash value does not satisfy the specified criteria, the miners change the nonce value and re-hash the block header. This process is repeated until a valid solution is discovered.[110] The rate at which individual mining machines can perform this hashing operation is often measured in terahashes per second (TH/s), *i.e.*, trillions of hashes per second.[111] For large mining entities, the rate at which they perform this hashing operation is often measures in "exahashes" per second (EH/s), *i.e.*, quintillions of hashes per second.[112] Miners typically perform this hashing operation using specialized mining computers that contain application-specific integrated circuits ("ASICs") that are designed specifically (and sometimes, solely) for processing the SHA-256 hash function (a type of SHA-2 hash function) used by the Bitcoin network.[113]

***Pool Mining***

41. "A mining pool is the consolidation of computational power amongst a group of cryptocurrency miners (nodes) who work collectively to solve mathematical problems in order to better their chances of receiving rewards."[114] "Pooled mining is a way for individual miners to

---

[109] The term "nonce" stands for "number used once." *See* http://learnmeabitcoin.com/technical/block/nonce/.

[110] https://medium.com/fcats-blockchain-incubator/understanding-the-bitcoin-blockchain-header-a2b0db06b515.

[111] https://www.coinwarz.com/mining/bitcoin/hardware.

[112] https://www.pcmag.com/encyclopedia/term/exahash.

[113] https://en.bitcoin.it/wiki/ASIC.

[114] https://crypto.com/glossary/mining-pool.

combine their hash power so that they can mine as if they are one big miner. The individual miners … share in the reward of any blocks found by the combined pool, adjusted by their contributed share of the hash power."[115] In other words, "[i]nstead of each miner working alone to solve complex mathematical problems (which is how new Bitcoin is created), a group of miners combine their computational power. When the pool successfully mines a Bitcoin block, the reward is distributed among all members according to the work each one provided."[116]

**ViaBTC Operates One of the World's Largest Bitcoin Mining Pools**

42. ViaBTC holds itself out as an industry leader, describing itself as "[t]he world's top all-inclusive mining pool" that provides "[g]lobal services in 150+ countries/regions" and covers "over 1 million users worldwide," with "[n]odes deployed all over the world."[117] ViaBTC is one of the largest Bitcoin mining pools in the world and ranks third in the global Bitcoin mining pool industry.[118] By mid-2025, ViaBTC's average Bitcoin hashrate had reached approximately 121.5 exahashes per second (EH/s)—over 121 quintillion (121,000,000,000,000,000,000) cryptographic calculations per second.[119] In the first half of 2025 alone, ViaBTC mined 3,680 blocks, accounting for 13.88% of all blocks mined during that period.[120]

---

[115] https://bitcoinmagazine.com/guides/what-are-bitcoin-mining-pools.

[116] https://www.blockchain-council.org/bitcoin/pros-and-cons-of-joining-a-bitcoin-mining-pool/.

[117] https://www.viabtc.com/en/aboutus.

[118] *See* https://www1.hkexnews.hk/listedco/listconews/sehk/2025/0624/2025062400636.pdf (June 2025 filing stating that "[c]urrently, ViaBTC ranks third in the global Bitcoin mining pool industry"); https://cryptonews.net/news/mining/31349014/ ("ViaBTC comes in third with 13.65% of the global hashrate according to mempool.space").

[119] https://www.viabtc.com/en/blog/mid-2025-review-how-are-the-top-bitcoin-mining-pools-doing-408 ("ViaBTC's average hashrate at the beginning of the year was 118.2 EH/s. By June, it reached 121.5 EH/s").

[120] https://www.viabtc.com/en/blog/mid-2025-review-how-are-the-top-bitcoin-mining-pools-doing-408.

43. The ViaBTC pool is a bitcoin "mining pool," i.e., it is "a group of miners who combine their computing power to solve the mathematical equations required to add new blocks to the blockchain."[121] Pool operators like ViaBTC orchestrate groups of miners who join the pool as "members" to contribute their computational resources (e.g., hashrate) toward solving the puzzle required to create new blocks, and share the block rewards.[122] In a mining pool, the pool operator sends "shares" of work to each member (e.g., a range of nonces to hash), and as the members complete their shares, they submit the results to the pool operator.[123] The pool operator uses the aggregated computing power of its members to operate nodes and validate blocks on the Bitcoin blockchain, and it distributes pro-rata shares of the proceeds (e.g., block rewards and transaction fees) to its members based on the computing power each contributes, less a fee retained by the pool operator.[124] ViaBTC offers several payout methodologies, including Pay Per Share Plus (PPS+) and Pay Per Last N Shares (PPLNS), and performs automatic settlement and payout each day, whereby ViaBTC distributes the block rewards and transaction fees earned by the pool among its members, less a fee retained by ViaBTC.[125]

---

[121] https://medium.com/foundry-digital/how-luck-impacts-bitcoin-miner-success-31d7f346ced6.

[122] *See* https://www.chainalysis.com/blog/crypto-mining-pools/; https://www.investopedia.com/terms/m/mining-pool.asp.

[123] *See* https://www.investopedia.com/terms/m/mining-pool.asp; https://www.chainalysis.com/blog/crypto-mining-pools/.

[124] *See* https://www.chainalysis.com/blog/crypto-mining-pools/; https://www.investopedia.com/terms/m/mining-pool.asp.

[125] https://support.viabtc.com/hc/en-us/articles/7207397084047-How-are-profits-calculated (ViaBTC "pool supports two payment methods: PPS+ (default), PPLNS," and describing the PPS+ payout as "composed of block reward and transaction fee"); https://support.viabtc.com/hc/en-us/articles/7207401012879-BTC-Mining ("Auto Withdrawal (ZERO fee and unified payment every day between 10:00 and 18:00 UTC+8)").

44. By ViaBTC's own account, the ViaBTC pool has generated "[t]ens of billions of dollars in cumulative mining output," and has provided cryptocurrency mining services for "over one million users" in "150+ countries and regions."[126] ViaBTC states that it "consistently rank[s] top in terms of hashrate, user reputation, and industry standing."[127]

45. ViaBTC provides its mining and related services to users throughout the world, including in the United States. ViaBTC operates "[g]lobal node deployment with low latency," and its blocks are broadcast by ViaBTC's own mining-pool software running on third-party cloud infrastructure.[128] ViaBTC distributes its "ViaBTC - Crypto Mining Pool" mobile application to users in the United States through the Apple App Store and Google Play, and identifies mining-industry partners located in the United States, including in Texas.[129]

46. ViaBTC publishes the network addresses of the stratum servers through which miners connect to and mine on the ViaBTC pool, and organizes those addresses by region. For bitcoin, ViaBTC publishes a set of "Global" addresses; a separate "Europe" address; and a set of dedicated "SSL addresses."[130]

47. On information and belief, ViaBTC operates such servers and Bitcoin nodes in the United States. ViaBTC advertises "[g]lobal node deployment with low latency" and states that it

[126] https://www.viabtc.com/en/.

[127] https://play.google.com/store/apps/details?hl=en-US&id=com.viabtc.pool&utm_source.

[128] https://www.viabtc.com/en/ ("Global node deployment with low latency,"); *see* https://b10c.me/observations/10-viabtc-blocks-without-witness-data/ (observing ViaBTC blocks "broadcast by their mining pool software" using "the ViaBTC '*bitpeer*' module").

[129] *See* https://apps.apple.com/us/app/viabtc-crypto-mining-pool/id1334584229; https://play.google.com/store/apps/details?id=com.viabtc.pool; https://www.viabtc.com/en/companies (listing United States mining-industry partners, including "BITCRUISER … Texas, USA").

[130] *See* https://support.viabtc.com/hc/en-us/articles/14367481714191-Mining-Pools-Information.

is "[s]erving 150+ countries and regions."[131] An analysis of ViaBTC's block propagation on the Bitcoin network reports that ViaBTC deploys its own mining-pool software on third-party cloud infrastructure operated by Amazon Web Services: ViaBTC "runs multiple bitpeer instances that connect to the Bitcoin P2P network to propagate ViaBTC's blocks and feed blocks from other pools into their mining server," and the network addresses of those instances "all belong to IP ranges owned by AWS" and "belong to different AWS regions."[132] Amazon Web Services operates multiple regions in the United States, including its "US East (Northern Virginia)", "US East (Ohio)", "US West (Oregon)", and "US West (Northern California)" regions.[133] On information and belief, the Amazon Web Services regions in which ViaBTC deploys its stratum servers and nodes include one or more regions located in the United States. On information and belief, ViaBTC's stratum servers and nodes located in the United States perform the methods claimed in the Asserted Patents, including by establishing and securing communication links with miners, distributing work to and receiving shares from miners, assembling and validating candidate blocks, and computing hashes.

48. ViaBTC's operation of stratum servers and nodes in the United States is confirmed by the economics of pool mining. A mining pool and its miners must exchange data continuously; the pool distributes new work each time the network advances, and each miner submits its completed shares back to the pool. When a share arrives after the pool has moved on, it is rejected as "stale" and earns nothing, even though the miner consumed the electricity to compute it.

---

[131] https://www.viabtc.com/en/.

[132] *See* https://b10c.me/observations/10-viabtc-blocks-without-witness-data/.

[133] *See* https://aws.amazon.com/about-aws/global-infrastructure/regions_az/ (listing Amazon Web Services regions, including "US East (Northern Virginia)", "US East (Ohio)", "US West (Oregon)", and "US West (Northern California)").

Because latency "depends on several factors, including the physical distance between the miner and the pool server," mining pools "operate multiple regional endpoints to reduce communication delays between ASIC miners and pool servers," allowing mining hardware "to connect to the nearest available node." A pool that serves United States miners from servers on another continent forfeits revenue on every stale share.[134] ViaBTC accordingly advertises "[g]lobal node deployment with low latency."[135] The same economics apply to the Bitcoin nodes from which ViaBTC obtains block templates and to which it submits mined blocks; any delay between ViaBTC's nodes and its mining servers leaves its miners working on a stale template. On information and belief, ViaBTC therefore operates both stratum servers and Bitcoin nodes in the United States, close to the United States miners it serves.

49. The United States is one of the largest bitcoin-mining jurisdiction in the world, accounting for roughly one-quarter of the global Bitcoin hashrate.[136] ViaBTC directs its services to that market. ViaBTC's own "Mining Farms" page identifies Core Scientific's facilities in

---

[134] https://emcd.io/articles/mining/internet-for-bitcoin-mining-latency-stale-shares-and-why-bandwidth-doesn-t-matter/ ("When network delays occur, valid mining results can arrive too late and become stale shares, which means no reward is received for that work"; "Latency depends on several factors, including the physical distance between the miner and the pool server"; "Mining pools operate multiple regional endpoints to reduce communication delays between ASIC miners and pool servers. Each endpoint represents a different server location, allowing hardware to connect to the nearest available node. Shorter distance reduces latency and improves the speed of job delivery and share submission"); *see also* https://www.sazmining.com/blog/low-latency-mining-pools-what-to-know ("Low-latency mining pools are built to minimize the time it takes for mining shares and blocks to travel from a miner's hardware to the pool's servers. They achieve this by using strategically placed servers"; "if you're mining in the United States but connecting to a server located in Asia, you'll likely experience higher latency"); https://sololuck.io/blog/latency-and-stale-work.

[135] https://www.viabtc.com/en/.

[136] *See* https://hashrateindex.com/hashrate/pools (Bitcoin mining pool data; selecting Pools by Countries); https://www.jbs.cam.ac.uk/wp-content/uploads/2025/04/2025-04-cambridge-digital-mining-industry-report.pdf (identifying the United States as the largest jurisdiction for bitcoin mining).

Georgia, Kentucky, and North Carolina among the farms associated with its pool; ViaBTC identifies business development personnel located in California; ViaBTC supports United States telephone numbers for account verification; and ViaBTC has exhibited and sponsored at bitcoin mining conferences in Las Vegas, Nevada, Miami, Florida, and Austin, Texas.[137]

**Defendant's Use of the Patented Technologies**

50. ViaBTC engages and has engaged in bitcoin mining and operates one of the world's largest Bitcoin mining pools.[138] ViaBTC performs automatic settlement and payout each day and distributes the block rewards and transaction fees earned by the pool to its members through its "PPS+ (default), PPLNS" and SOLO payout methods.[139]

51. On information and belief, ViaBTC engages and has engaged in bitcoin mining using specialized mining computers, nodes, and other equipment. ViaBTC operates "[g]lobal node

---

[137] *See* https://www.viabtc.net/en/farms (ViaBTC's "Mining Farms" page, listing Core Scientific facilities in Georgia, Kentucky, and North Carolina); https://www.viabtc.com/en/aboutus (identifying ViaBTC business development personnel, including Phillip Wang); https://www.linkedin.com/in/phillip-wang-50b08237/ (Philip Wang is located in California according to his LinkedIn); https://support.viabtc.com/hc/en-us/articles/7207399782031-Supported-SMS-Countries-Regions (listing the United States among the countries and regions whose telephone numbers receive ViaBTC verification codes); https://news.bitcoin.com/viabtc-showcased-global-mining-leadership-at-bitcoin-conference-2025-in-las-vegas/ (ViaBTC exhibiting at the Bitcoin Conference 2025 in Las Vegas, Nevada); https://www.viabtc.com/en/blog/News-333?category=0 (Mining Disrupt 2024, Miami, Florida).

[138] https://www.viabtc.com/en/ (describing ViaBTC as "[w]orld's leading all-in-one crypto mining pool"); *see* https://www1.hkexnews.hk/listedco/listconews/sehk/2025/0624/2025062400636.pdf ("ViaBTC ranks third in the global Bitcoin mining pool industry") at 2.

[139] https://support.viabtc.com/hc/en-us/articles/7207401012879-BTC-Mining ("Auto Withdrawal (ZERO fee and unified payment every day between 10:00 and 18:00 UTC+8)"); https://support.viabtc.com/hc/en-us/articles/7207397084047-How-are-profits-calculated (ViaBTC "pool supports two payment methods: PPS+ (default), PPLNS").

deployment" through a "high-performance distributed Bitcoin mining pool server."[140] On information and belief, ViaBTC builds and operates server nodes that connect to Bitcoin full nodes, obtain block templates, and assemble candidate blocks and their coinbase transactions; ViaBTC's mining server obtains "mining task from the Bitcoin node," and "[i]f a new block is successfully mined, it will be submitted to the node and broadcast."[141]

52. On information and belief, ViaBTC is responsible for the generation of digital signatures, including digital signatures consistent with the Bitcoin protocol using ECDSA and the secp256k1 elliptic curve. For example, ViaBTC distributes mined bitcoin to the wallet addresses of its members in on-chain transactions, and provides that "all your transactions will be broadcast and paid as soon as ViaBTC has mined a new block."[142] On information and belief, to transfer that bitcoin, ViaBTC generates and signs Bitcoin transactions using private cryptographic keys, which under the Bitcoin protocol requires generating an ECDSA signature over the secp256k1 curve.[143]

---

[140] https://www.viabtc.com/en/ ("Global node deployment with low latency"); https://github.com/viabtc/viabtc_mining_server (describing "ViaBTC Mining Server" as "a high-performance distributed Bitcoin mining pool server").

[141] https://github.com/viabtc/viabtc_mining_server (ViaBTC's mining server obtains "mining task from the Bitcoin node," and "[i]f a new block is successfully mined, it will be submitted to the node and broadcast"); *see* https://deepwiki.com/viabtc/viabtc_mining_server/4.2-block-submission-and-propagation (describing assembly of the "coinbase transaction" and submission of the block "via RPC").

[142] https://support.viabtc.com/hc/en-us/articles/7207382307599-How-to-Set-Up-Auto-Withdrawal (ViaBTC "will automatically withdraw to the address you preset," and "all your transactions will be broadcast and paid as soon as ViaBTC has mined a new block").

[143] *See* https://developer.bitcoin.org/devguide/transactions.html ("Bitcoin uses the Elliptic Curve Digital Signature Algorithm (ECDSA) with the secp256k1 curve"); https://learnmeabitcoin.com/technical/cryptography/elliptic-curve/ecdsa/ (explaining that only the holder of "the correct private key … is able to generate valid signatures" to spend bitcoin).

53. On information and belief, ViaBTC is responsible for the verification of digital signatures, including digital signatures consistent with the Bitcoin protocol using ECDSA and the secp256k1 elliptic curve. For example, ViaBTC operates full nodes and assembles candidate blocks; under the Bitcoin protocol, validating the transactions selected for inclusion in a block requires verifying the ECDSA signatures that authorize those transactions.[144] On information and belief, such verification includes recovering the signer's public key from the components of the signature and using the recovered public key to verify the signature, as reflected in the public-key-recovery functionality of the secp256k1 library used in the Bitcoin system.[145]

54. On information and belief, the mining machines that mine on the ViaBTC pool perform the hash processing used to mine Bitcoin, including computation of the SHA-256 hash algorithm. ViaBTC mines Bitcoin using the "SHA256d" algorithm, and its mining server assembles blocks by "[c]alculating the block hash (double SHA-256)."[146] Under the Bitcoin protocol, mining a block requires repeatedly computing SHA-256 hashes of the block header until the resulting hash satisfies the network's difficulty target.[147]

---

[144] *See* https://github.com/viabtc/viabtc_mining_server (ViaBTC's "Bitpeer … [i]mplements the bitcoin p2p protocol and is connectable to multiple bitcoin nodes"); https://bitcoin.org/en/full-node ("A full node is a program that fully validates transactions and blocks"); https://developer.bitcoin.org/devguide/transactions.html ("Each peer and miner independently validates the transaction").

[145] *See* https://github.com/bitcoin-core/secp256k1 (Bitcoin Core's secp256k1 library, the "primary focus of [whose] development has been for usage in the Bitcoin system," and which includes an "[o]ptional module for public key recovery").

[146] https://www.viabtc.com/en/ (Bitcoin mined using "Algorithm SHA256d"); https://deepwiki.com/viabtc/viabtc_mining_server/4.2-block-submission-and-propagation (ViaBTC's mining server assembles blocks by "[c]alculating the block hash (double SHA-256)").

[147] *See* Bitcoin Whitepaper at 3 (proof-of-work implemented by "incrementing a nonce in the block until a value is found that gives the block's hash the required zero bits"); https://en.bitcoin.it/wiki/Block_hashing_algorithm.

55. On information and belief, ViaBTC uses digital asset wallets for receiving and transferring bitcoin. For example, ViaBTC requires its members to configure a payout "address (on-chain addresses only)" to receive payouts, and provides a "[b]uilt-in multi-cryptocurrency wallet for deposits and withdrawals."[148]

56. On information and belief, ViaBTC is responsible for securing the communication links between its mining-pool servers and the miners that mine on the ViaBTC pool. ViaBTC operates stratum servers that communicate with each miner (or "worker") over a communication link, and publishes the addresses through which those links are established, including dedicated "SSL addresses" such as "btc-ssl.viabtc.io:551", "btc-ssl.powhashing.com:3333", and "bch-ssl.powhashing.com:5555". On information and belief, ViaBTC secures those communication links, and its other communications with its users, using the Transport Layer Security (TLS) protocol.[149] TLS is a protocol that "provides privacy and data integrity between two communicating applications" and is "composed of two layers: the TLS Record Protocol and the TLS Handshake Protocol."[150]

57. On information and belief, ViaBTC secures the communication links between its servers and the ViaBTC mobile application, which ViaBTC publishes and distributes to users in

---

[148] https://support.viabtc.com/hc/en-us/articles/7207382307599-How-to-Set-Up-Auto-Withdrawal (requiring members to set a payout "address (on-chain addresses only)"); https://www.viabtc.com/en/ ("Built-in multi-cryptocurrency wallet for deposits and withdrawals").

[149] Transport Layer Security (TLS), the successor to the Secure Sockets Layer (SSL) protocol, is a protocol used for protecting the confidentiality and integrity of communications between two parties. *See* https://csrc.nist.gov/glossary/term/secure_sockets_layer; https://www.rfc-editor.org/rfc/rfc8446 (The Transport Layer Security (TLS) Protocol Version 1.3). ViaBTC publishes dedicated "SSL addresses" for connecting to its mining pools. *See* https://support.viabtc.com/hc/en-us/articles/14367481714191-Mining-Pools-Information.

[150] *See* https://csrc.nist.gov/glossary/term/secure_sockets_layer.

the United States through the Apple App Store and Google Play, and through which users access and manage their ViaBTC mining accounts.[151] On information and belief, when the ViaBTC mobile application communicates with ViaBTC's servers, ViaBTC's servers secure that communication link in the manner described above. As set forth above, ViaBTC performs these methods on mining-pool servers located in the United States.

58. On information and belief, ViaBTC performs these same operations on the servers for each of the mining pools it operates, including its Bitcoin (BTC), Bitcoin Cash (BCH), Litecoin (LTC), Ethereum Classic (ETC), ZCash (ZEC), DASH, HNS, CKB, and KAS mining pool servers.[152] ViaBTC publishes dedicated "SSL addresses" through which miners connect to those pools, including for its Bitcoin, Bitcoin Cash, Litecoin, ZCash, and KAS mining pools.[153] On information and belief, the servers that establish and terminate those secured links include servers ViaBTC operates in the United States.[154] On information and belief, and as specified by the TLS protocol, establishing such a secured link includes generating a first cryptographic key, generating a second cryptographic key, computing a hash over the handshake packets exchanged between the two devices, and deriving from those cryptographic keys and that hash result the further key or keys used to secure the link.[155]

---

[151] *See* https://apps.apple.com/us/app/viabtc-crypto-mining-pool/id1334584229 (ViaBTC's "ViaBTC - Crypto Mining Pool" application, distributed to users in the United States).

[152] *See* https://support.viabtc.com/hc/en-us/articles/14367481714191-Mining-Pools-Information (identifying ViaBTC's mining pools and their pool URLs for BTC, BCH, LTC, ETC, ZEC, DASH, HNS, CKB, and KAS); https://www.viabtc.com/en/.

[153] *See* https://support.viabtc.com/hc/en-us/articles/14367481714191-Mining-Pools-Information.

[154] *See supra* ¶¶ 46-49 and accompanying notes.

[155] *See* https://www.rfc-editor.org/rfc/rfc8446 ("The primary goal of TLS is to provide a secure channel between two communicating peers"; describing the "Transcript-Hash" computed over the handshake messages exchanged between the two endpoints (§ 4.4.1) and the "Key Schedule"

59. ViaBTC advertises mining across numerous cryptocurrencies, including Bitcoin Cash, Litecoin, Ethereum Classic, ZCash, DASH, HNS, CKB, and KAS. The operations described above are not particular to any one cryptocurrency: the securing of the communication links between ViaBTC's stratum servers and the miners that connect to them is performed by those servers in the same manner regardless of which cryptocurrency is being mined. Nor is ViaBTC's generation and verification of digital signatures particular to Bitcoin. On information and belief, several of the additional cryptocurrencies for which ViaBTC operates mining pools are implemented in client software derived from the Bitcoin Core codebase, and those clients generate and verify digital signatures by calling the same secp256k1 library that Bitcoin Core uses.[156]

60. ViaBTC began engaging in the foregoing infringing activities years after Certicom and BlackBerry invented and received patents covering the ECC technologies at issue in this action. Indeed, these innovations were already incorporated into the Bitcoin protocol and architecture by the time ViaBTC launched its Bitcoin mining pool in 2016, and ViaBTC has continued the foregoing activities to the present.

---

by which the handshake and application traffic keys are derived from that transcript hash together with previously derived secrets (§ 7.1)); *see also* https://www.rfc-editor.org/rfc/rfc5869.

[156] *See, e.g.*, https://github.com/litecoin-project/litecoin (the Litecoin Core repository is "forked from bitcoin/bitcoin"); https://gitlab.com/bitcoin-cash-node/bitcoin-cash-node ("Bitcoin Cash Node is the name of open-source software which enables the use of Bitcoin Cash. It is a descendant of the Bitcoin Core and Bitcoin ABC software projects."); https://github.com/zcash/zcash ("The zcashd code was derived from a source fork of Bitcoin Core. The code was forked initially from Bitcoin Core v0.11.2[.]"); https://github.com/dashpay/dash (the Dash Core repository is "forked from bitcoin/bitcoin"); https://github.com/etclabscore/core-geth (core-geth, which supports Ethereum Classic, is "[a]n ethereum/go-ethereum downstream effort"); https://pkg.go.dev/github.com/ethereum/go-ethereum/crypto/secp256k1 (that client's secp256k1 package "wraps the bitcoin secp256k1 C library").

## PATENTS IN SUIT

61. Malikie is the assignee of and owns all right and title to U.S. Patent Nos. 8,788,827 (the "'827 Patent"); 8,806,197 (the "'197 Patent"); 8,532,286 (the "'286 Patent"); 8,712,039 (the "'039 Patent"); and 8,694,769 (the "'769 Patent") (collectively, the "Asserted Patents").

62. The Asserted Patents, now owned by Malikie, were originally assigned to Certicom. Their inventors are former Certicom employees who spearheaded Certicom's industry-leading research and development in elliptic curve cryptography, applied cryptography and key management, and other data security technologies. After a longstanding alliance between BlackBerry and Certicom that enabled BlackBerry to utilize Certicom's elliptic curve cryptography technology in its products, BlackBerry acquired Certicom in 2009.[157] Through its acquisition of Certicom and continued research and development in ECC, key management, and other aspects of data security, BlackBerry amassed "the world's largest ECC-based patent portfolio,"[158] which grew to include over 500 ECC patents[159].

63. Certicom and BlackBerry developed numerous innovative and diverse technologies, including groundbreaking inventions pertaining to generating and verifying digital signatures and related cryptographic and data security technology. Some of these groundbreaking inventions are described and claimed in certain of the Asserted Patents.

### The "Accelerated Verification Patents" ('827, '197)

64. Plaintiffs incorporate by reference the preceding paragraphs of this Complaint.

---

[157] *See* https://www.certicom.com/content/certicom/en/about.html; https://www.certicom.com/content/certicom/en/about/news/release/2000/research-in-motion-and-certicom-to-enable-trusted-mobile-commerc.html.

[158] https://www.certicom.com/content/certicom/en/about.html.

[159] https://blackberry.certicom.com/en; https://www.certicom.com/.

65. The ’827 Patent, entitled “Accelerated Verification of Digital Signatures and Public Keys,” was duly and lawfully issued on July 22, 2014. A true and correct copy of the ’827 Patent is attached hereto as Exhibit 1. The application for the ’827 Patent was filed on September 14, 2012 and claims the benefit of priority to earlier related applications, including provisional application no. 60/644,034, filed on January 18, 2005.

66. The ’827 Patent was in full force and effect from its issuance until its expiration on January 18, 2026. Malikie owns by assignment the entire right and title in and to the ’827 Patent, including the right to seek damages for any infringement thereof.

67. The ’197 Patent, entitled “Accelerated Verification of Digital Signatures and Public Keys,” was duly and lawfully issued on August 12, 2014. A true and correct copy of the ’197 Patent is attached hereto as Exhibit 2. The application for the ’197 Patent was filed on May 23, 2012 and claims the benefit of priority to earlier related applications, including provisional application no. 60/644,034, filed on January 18, 2005.

68. The ’197 Patent was in full force and effect since its issuance until its expiration on January 18, 2026. Malikie owns by assignment the entire right and title in and to the ’197 Patent, including the right to seek damages for any infringement thereof.

69. The’827 Patent and ’197 Patent (the “Accelerated Verification Patents”) share the same title, specification, inventors, and a common priority claim.

70. The Accelerated Verification Patents relate to computational techniques used in cryptographic algorithms, including elliptic curve algorithms for generating and verifying digital signatures, that enable accelerated digital signature verification. *See* Ex. 1 at 1:12-13, 4:15-33, 9:32-37, 11:43-50, 12:47-59, 13:60-62, 14:40-42, 15:27-40.

71. Cryptographic algorithms for generating and verifying digital signatures are used in cryptographic systems (or "cryptosystems") to secure electronic data in computer systems and computer networks. *See* Ex. 1 at 1:18-48; *see also*, *e.g.*, 2:17-3:17, 6:23-36. The nature of electronic data in computer systems and computer networks presents unique security concerns relating to, for example, digital message authenticity, for which specialized digital signature techniques were found to be necessary. *See* Ex. 1 at 1:18-48; *see also*, *e.g.*, *id.* at 2:17-3:17; Whitfield Diffie and Martin Hellman, *New Directions in Cryptography* (1976)[160] at 645 ("Current electronic authentication techniques cannot meet this need."), 647 ("Unforgeable digital signatures and receipts are needed."), 649 ("Current electronic authentication systems cannot meet the need for a purely digital, unforgeable, message dependent signature. They provide protection against third party forgeries, but do not protect against disputes between transmitter and receiver."), 649 (observing that "we must discover a digital phenomenon" to provide authentication for a "purely electronic form of communication").

72. Digital signatures are generated using public key cryptography, *see* Ex. 1 at 1:18-48; *see also id.* at 2:17-3:17, which is a type of technology for securing electronic communications that was discovered after the advent of digital computing to address cryptography problems arising particularly in "computer controlled communication networks" that created "a need for new types of cryptographic systems."[161] *New Directions in Cryptography* at 644; *see also id.* ("Contemporary cryptography is unable to meet the requirements, in that its use would impose

[160] https://ee.stanford.edu/~hellman/publications/24.pdf ("*New Directions in Cryptography*").
[161] Some credit Whitfield Diffie, Martin Hellman, and Ralph Merkle with discovering public key cryptography, while others credit James Ellis, Clifford Cocks, and Malcom Williamson. Diffie, Hellman, and Merkle have received multiple patents for public key cryptography techniques, including U.S. Patent Nos. 4,200,770 and 4,218,582. Other public key cryptography techniques, like RSA, have also been patented. *See*, *e.g.*, U.S. Patent No. 4,405,829.

such severe inconveniences on the system users, as to eliminate many of the benefits of teleprocessing."); https://www.invent.org/inductees/whitfield-diffie ("In 1976, Whitfield Diffie, Martin Hellman, and Ralph Merkle developed public key cryptography (PKC), an innovative new method for securing electronic communications."); https://web.archive.org/web/20250708132542/https:/archive.nytimes.com/www.nytimes.com/library/cyber/week/122497encrypt.html ("The set of algorithms, equations and arcane mathematics that make up public key cryptography are a crucial technology for preserving computer privacy in and making commerce possible on the Internet. Some hail its discovery as one of the most important accomplishments of 20th-century mathematics …. Without it, there would be no privacy in cyberspace."); Whitfield Diffie, *The First Ten Years of Public-Key Cryptography* (1988)[162] at 560 ("Public key cryptography was born in May 1975, the child of two problems," where "[t]he second problem … was the problem of signatures. Could a method be devised that would provide the recipient of a purely digital electronic message with a way of demonstrating to other people that it had come from a particular person…?"); *id.* ("This separation [of the capacities for encryption and decryption using public key cryptography] allows important improvements in the management of cryptographic keys and makes it possible to 'sign' a purely digital message."); https://bitcoinwiki.org/wiki/public-key-cryptography ("Public key algorithms are fundamental security ingredients in modern [ ] applications and protocols assuring the confidentiality[ and] authenticity [ ] of electronic communications and data storage. They underpin various Internet standards …."); https://www.nsa.gov/History/Cryptologic-History/Historical-Figures/Historical-Figures-View/Article/3006218/clifford-cocks-james-ellis-and-malcolm-williamson/ ("The

---

[162] https://www.cs.virginia.edu/~evans/greatworks/diffie.pdf ("*The First Ten Years of Public-Key Cryptography*").

security of the global communication infrastructure is built on public key cryptography and the importance of PKC in enabling the modern world of secure banking, e-commerce, and encrypted messaging cannot be overstated.”).

73. As the patents explain, “Public key cryptography permits the secure communication over a data communication system without the necessity to transfer identical keys to other parties in the information exchange through independent mechanisms, such as a courier or the like.” *See* Ex. 1 at 1:24-34. “Public key cryptography is based upon the generation of a key pair, one of which is private and the other public that are related by a one way mathematical function.” *Id.* “The one way function is such that, in the underlying mathematical structure, the public key is readily computed from the private key but the private key cannot feasibly be ascertained from the public key.” *Id.* “Public key cryptography may also be used to digitally sign a message to authenticate the origin of the message.” *Id.* at 1:44-48. “The author of the message signs the message using his private key and the authenticity of the message may then be verified using the corresponding public key.” *Id.* So, in a network where members do not know each other (or wish to remain pseudonymous) and have never even communicated with each other previously, “[a] subscriber can sign a message by encrypting it with his own secret key. Anyone with access to the public key can verify that it must have been encrypted with the corresponding secret key, but this is of no help to him in creating (forging) a message with this property.” *The First Ten Years of Public-Key Cryptography* at 561. “The availability of a signature that the receiver of a message cannot forge and the sender cannot readily disavow makes it possible to trust the network with negotiations and transactions of much higher value than would otherwise be possible.” *Id.* Accordingly, digital signature technology based on public key cryptography fundamentally

enables "trustless" networks that do not require a trusted intermediary to verify or authenticate messages.

74. The patents further explain that "[t]he security of such systems [employing digital signatures using public key cryptography] is dependent to a large part on the underlying mathematical structure." *See* Ex. 1 at 1:49-55. "The most commonly used structure for implementing discrete logarithm systems is a cyclic subgroup of a multiplicative group of a finite field in which the group operation is multiplication or cyclic subgroups of elliptic curve groups in which the group operation is addition." *Id.*

75. "An elliptic curve E is a set of points of the form (x,y) where x and y are in a field F, such as the integers modulo a prime [number] p, commonly referred to as Fp, and x and y satisfy a non-singular cubic equation, which can take the form $y^2=x^3+ax+b$ for some a and b in F." *Id.* at 1:56-2:16. Elliptic curves have other defining characteristics that give them special properties making them useful for cryptographic implementations. *See id.*

76. "In an elliptic curve cryptosystem," "[t]he key pair may be used with various cryptographic algorithms to establish common keys for encryption and to perform digital signatures." *Id.* at 2:17-27. "One such algorithm is the Elliptic Curve Digital Signature Algorithm (ECDSA) used to generate digital signatures on messages exchanged between entities. Entities using ECDSA have two roles, that of a signer and that of a verifier." *Id.* at 2:28-31. In ECDSA cryptosystems, "[the] signer selects a long term private key d, which ... must be secret." *Id.* at 2:31-41. The signer also computes "Q", which is "the long-term public key of the signer, and is made available to the verifiers." *Id.* "Finding the private key d from the public key Q is believed to [be] an intractable problem for the choices of elliptic curves used today." *Id.* Accordingly, "[f]or any message M, the signer can create a signature, which is a pair of integers (r, s) in the case

ECDSA," and "[a]ny verifier can take the message M, the public key Q, and the signature (r, s), and verify whether it was created by the corresponding signer." *Id.* at 2:42-48. "This is because creation of a valid signature (r, s) is believed to be possible only by an entity who knows the private key d corresponding to the public key Q." *Id.*

77. The process for creating a digital signature (signing an electronic message) using ECDSA includes, among others, the following steps. "First, the signer chooses some integer k … that is to be used as a session, or ephemeral, private key. The value k must be secret." *Id.* at 2:49-63. "Then, the signer computes a point R=kG that has co-ordinates (x, y)." *Id.* "Next, the signer converts x to an integer x' and then computes r=x' mod n, which is the first coordinate of the signature." *Id.* "The signer must also compute the integer e=h(M) mod n, where h is [a] hash function." *Id.* "Finally, the second coordinate s is computed as s=(e+dr)/s mod n." *Id.* "The components (r, s) are used by the signer as the signature of the message, M, and sent with the message to the intended recipient." *Id.*

78. The process for verifying a digital signature created using ECDSA includes, among others, the following steps. "First the verifier computes an integer e=h(M) mod n from the received message." Ex. 1 at 2:64-3:4. "Then the verifier computes integers u and v such that u=e/s mod n and v=r/s mod n." *Id.* "Next, the verifier computes a value corresponding to the point R that is obtained by adding uG+vQ. This has co-ordinates (x, y)." *Id.* "Finally the verifier converts the field element x to an integer x' and checks that r=x' mod n. If it does the signature is verified." *Id.*

79. The inventors recognized technological problems associated with the above-described ECDSA signature verification process and invented ways to improve it. For example, the inventors recognized that "the verification of an ECDSA signature appears to take twice as long as the creation of an ECDSA signature, because the verification process involves two scalar

multiplications, namely uG and vQ, whereas signing involves only one scalar multiplication, namely kG." Ex. 1 at 3:5–17. The inventors further recognized that "[e]lliptic curve scalar multiplications consume most of the time of these processes, so twice as many of them essentially doubles the computation time." *Id.* And, while some "[m]ethods are known for computing uG+vQ that takes less time than computing uG and v[Q] separately," the inventors recognized that such methods nevertheless "mean that computing uG+vQ can take 1.5 times as long as computing kG." *Id.*

80. Accelerating elliptic curve computations (reducing computing time) is a technological problem for which the inventors discovered technological solutions. Accelerating elliptic curve computations requires the use of additional computer resources, such as memory and processing capabilities. *See* Ex. 1 at 3:18-4:14. However, known techniques for accelerating elliptic curve computations provided limited overall benefits to the overall computer architecture because the ability to achieve faster operations came at the significant cost of more memory and potentially wasteful pre-computation processing cycles. *Id.* The inventors recognized that "these costs may accumulate to the point that any benefit of faster computation is offset by the need to store or communicate" more pre-computed data. Moreover, "[t]he net benefit depends on the relative cost of time, memory and bandwidth, which can vary tremendously between implementations and systems." *Id.* Accordingly, achieving such benefits required case-by-case optimizations of parameters to strike a balance between an achievable increase in speed with increases in computational and memory costs. *See id.*

81. The inventors taught improvements to the ECDSA digital signature verification process. Ex. 1 at 4:15-33. For example, the patents teach techniques that enable accelerated signature verification, which include, among other things, generating, for use with a digital

signature (*e.g.*, a signature with components (r, s)), an indicator (*e.g.*, i) to identify which value of a plurality of values (*e.g.*, for a point with coordinates (x, y)) recover able from the first signature component (*e.g.*, r of the pair (r, s)) is an ephemeral public key (*e.g.*, R). *See* Ex. 1 at 5:23-31, 6:37–7:38, 9:44-46, 10:61–11:5, 12:11–59, 15:29–33. The patents teach that such techniques accelerate the recovery of, for example, an ephemeral public key (*e.g.*, R) for verifying digital signatures (thereby also accelerating digital signature verification), which provide a technological improvement. *See*, *e.g.*, *id*.

82. The patents also teach techniques that enable accelerated digital signature verification, which include, among other things, recovering (or generating) a signer's public key (*e.g.*, Q) from the digital signature of a message, where doing so includes computing Q as $r^{-1}$(sR-eG) using components of the digital signature (rather than sending Q in the message or retrieving it elsewhere), where G comprises a generator of an elliptic curve group that includes a first elliptic curve point R and the second elliptic curve point Q. *See* Ex. 1 at 4:48-5:4; 7:39–58, 8:12–9:31, 9:67–10:34, 12:43–59, 13:1–26, 15:15–40. The patents teach that such techniques reduce bandwidth and storage and accelerate the verification of digital signatures, allowing more digital signatures to be verified in a given amount of time, which provide technological improvements over preexisting techniques. *See id*.

**The "Improved Modular Reduction" Patent ('286)**

83. Plaintiffs incorporate by reference the preceding paragraphs of this Complaint.

84. The '286 Patent, entitled "System and Method for Reducing the Computation and Storage Requirements for a Montgomery-Style Reduction," was duly and lawfully issued on September 10, 2013. A true and correct copy of the '286 Patent is attached hereto as Exhibit 3.

The application for the ’286 Patent was filed on July 19, 2010, and claims the benefit of priority of Provisional App. No. 61/226,427, filed on July 17, 2009.

85. The ’286 Patent has been and continues to be in full force and effect since its issuance. Malikie owns by assignment the entire right and title in and to the ’268 Patent, including the right to seek damages for any infringement thereof.

86. The ’286 Patent relates generally to systems and methods for reducing the computation and storage requirements for a Montgomery style reduction (a form of modular arithmetic). *See* Ex. 3 at 1:13–16; *see also id.*, Abstract.

87. The patent teaches that “[i]n cryptography, e.g. public key cryptography, operations such as multiplication or exponentiation of integers in some group $Z_n$, may be required, where modular arithmetic is used to operate on the integers.” Ex. 3 at 1:20–30. “For example, to multiply two numbers modulo some [number] n, the classical approach is to first perform the multiplication and then calculate the remainder.”[163] *Id.* The patent teaches that “[a]lthough the classical approach is simple for basic operations such as in multi-precision calculations and does not require precomputation, the step of calculating the remainder is considered slow.” *Id.* “The calculation of the remainder is referred to as reduction in modular arithmetic.” *Id.*

88. The patent further teaches that “[i]n Montgomery reduction, calculations with respect to a modulus n are carried out with the aid of an auxiliary number R called the Montgomery radix or base.” Ex. 3 at 1:47–64. For example, “[t]he Montgomery reduction of a number a with radix R and prime modulus n is the quantity given by $aR^{-1}$ mod n.” *Id.*

[163] The term “modulo” means to calculate the remainder after dividing one number by another. *See*, *e.g.*, https://www.mathsisfun.com/definitions/modulo-operation.html; *see also* https://en.wikipedia.org/wiki/Modulo (“In computing and mathematics, the modulo operation returns the remainder or signed remainder of a division, after one number is divided by another, the latter being called the modulus of the operation.”

89. “In a given cryptographic system,” the patent teaches, “a computational engine may be used for calculating the Montgomery product of two numbers, this engine being sometimes referred to as a Montgomery engine or Montgomery machine.” Ex. 3 at 1:65–2:13. The patent further teaches that “[t]he engine may be implemented in a hardware or software module and operates on a set of parameters to produce a result.” *Id.* For example, using a Montgomery engine, “Montgomery multiplication may proceed as follows:

1. $c \leftarrow 0$, where c will hold the result $abR^{-1}$ mod n and $c = (c_k c_{k-1} \ldots c_1 c_0)$.

2. For i from 0 to (k-1) do the following:
2.1 $m \leftarrow (c_0 + a_i, b_o)\mu \bmod 2^w$; and
2.2 $c \leftarrow (c + a_i b + mn)/2^w$

3. If $c \geqq n$ then $c \leftarrow c - n$

4. Return (c).”

Ex. 3 at 2:14–33.

90. “In Montgomery reduction, the value μ is used to zero w least significant bits of a value a,” whereby “[f]irst, a multiplier $m=\mu a \bmod 2^w$ is computed,” where “[t]he value m has at most w bits.” Ex. 3 at 2:47–53. “Adding a+mn will zero w least significant bits of a, and a may be shifted down w bits.” *Id.* “Since typically L=kw, where k is the number of w-bit words in R[,] this operation is repeated k times to effect the Montgomery reduction $aR^{-1}$ mod n.” *Id.*

91. The patent teaches that “efficiency may be increased by pre-computing certain fixed values to be used in the calculations,” where “[s]uch values include $\mu=(-n)^{-1} \bmod 2^w$, for some w typically being the bit size of a word (or block) of the value (or perhaps the entire value) being operated on; and $R^2$ mod n.” Ex. 3 at 2:34–46.

92. The patent further teaches that "[i]n a register-based processor, registers are typically used to hold components of the value to be reduced, namely the precomputed value μ and the modulus n." Ex. 3 at 2:59–61.

93. The inventors recognized these technological problems and discovered improvements in modular reduction engines for computers (e.g., Montgomery engines) to address them. *See* Ex. 3 at 3:21–45, 5:28–36, 3:40–45, 5:24–35, 5:45–6:19, 6:51–65.

94. For example, the patent teaches techniques for performing, on a cryptographic apparatus, a Montgomery-style reduction in a cryptographic operation that includes obtaining an operand for the cryptographic operation; computing a modified operand using a reduction value, instead of a modulus used in performing a standard Montgomery reduction, to perform a replacement of a least significant word of the operand, rather than per form a cancellation thereof, where the reduction value is a function of the modulus; and outputting the modified operand. *See*, *e.g.*, Ex. 3 at 4:40–6:65. The patent teaches that such inventive techniques can reduce the number of multiplications and registers needed to effect the modular reduction, thereby providing a new and inventive technique for efficient modular reduction machines.[164] *See*, *e.g.*, *id.* at 3:40–42, 5:28–36, 6:2–19, 6:51–65. For example, the patent teaches that "[i]n a machine 22 that has a limited number of registers and/or computational capabilities, it is desirable to reduce both the number of stored values and the number of computations," and that "[t]o avoid having to store both μ and n, it has been recognized by the inventor that a modified reduction value or a logical shift or signed version of such a value can be used in place of μ and n for the bulk of the low-order

[164] A register is hardware in a CPU for temporary storage of data during program execution. *See*, *e.g.*, https://techterms.com/definition/register; https://www.allaboutcircuits.com/video-lectures/internal-registers-alu/; https://gunkies.org/wiki/Register; https://www.theiotacademy.co/blog/registers-in-cpu/.

reduction." *Id.* at 5:28–35. The patent also teaches that the inventive technique "avoids both the multiplication necessary to compute m and the storage required for μ" and that the modified reduction value "does not require more registers than would be needed" otherwise. *Id.* at 6:2–19. The patent further teaches that the inventors observed significant benefits of the inventive techniques when used, for example, to perform ECC operations using resource-constrained computer processor architectures (*e.g.*, "the popular ARM architecture"). *Id.* at 6:51–65.

**The "Improved Hash Processing Patent" ('039)**

95. Plaintiffs incorporate by reference the preceding paragraphs of this Complaint.

96. The '039 Patent, entitled "Efficient Implementation of Hash Algorithm on a Processor," was duly and lawfully issued on April 29, 2014. A true and correct copy of the '039 Patent is attached hereto as Exhibit 4. The application for the '039 Patent was filed on April 5, 2012, and claims the benefit of priority of Provisional App. No. 61/472,422, filed on April 6, 2011.

97. The '039 Patent has been and continues to be in full force and effect since its issuance. Malikie owns by assignment the entire right and title in and to the '039 Patent, including the right to seek damages for any infringement thereof.

98. The '039 Patent relates generally to systems and methods for efficient implementations of hash algorithms on a computer processor, including techniques for utilizing a processor's registers to efficiently perform multiple iterations of SHA-2 family secure hash algorithms. *See* Ex. 4 at 1:17-20, 1:39-54, 2:8-20; *see also id.*, Abstract.

99. The patent teaches that an issue related to processing secure hash algorithms, such as secure hash algorithms in the SHA-2 family[165], is that implementing such secure hash

[165] The SHA-2 family includes, for example, SHA-256, SHA-384, and SHA-512, among others. *See* https://csrc.nist.gov/projects/hash-functions/nist-policy-on-hash-functions; https://csrc.nist.gov/files/pubs/fips/180-3/final/docs/fips180-3_final.pdf at 3.

algorithms on advanced processor architectures, such as ARM processors, is challenging because the number of available registers is insufficient to store the entire state of the secure hash algorithm, such that "only portions of it at a time would be loaded into them and undergo the necessary calculations before being stored back on the stack." *Id.* at 1:39-54. The patent teaches that "[t]he challenge lies in optimizing the registers utilization and minimizing the relatively lengthy load operations." *Id.*

100. The inventors recognized these technological problems and discovered improved ways to implement secure hash algorithms in computer processors to address them. *See* Ex. 4 at 2:8-20, 2:65-5:49. For example, the patent teaches methods and systems for maximizing a number of registers at an end of an iteration of a hash algorithm for use in a next iteration, comprising categorizing and unrolling iterations of an original secure hash algorithm into even iterations and odd iterations, reversing a sequence of computations in the even iterations to those in the odd iterations that results in an average number of words that need to be loaded into the registers per iteration being reduced by at least one-half compared to the original secure hash algorithm, and combining an even iteration and odd iteration to provide a new iteration of a loop. *See*, *e.g.*, *id*. at 2:8-20, 2:65-5:49, 11:38-49. For example, the patent teaches that in certain embodiments, words may be 64 bits long while the processor registers are 32 bits long. *Id.* at 3:1-3. The state of every iteration of the secure hash algorithm may include, for example, eight 64-bit words (*e.g.*, A-H) such that the block to be hashed includes sixteen 64-bit words. *Id.* at 3:4-9. Whereas with an original secure hash algorithm all the values of words A-H require load operations from the stack into the registers to undergo the specified functions, "[t]he present embodiment minimizes the number of load instructions required in every iteration by reusing values from the previous iteration that are still in the registers," which "is achieved by categorizing, and unrolling, the

algorithm iterations into even and odd ones, where the sequence of computation in the even iteration is reversed." *Id*. at 3:49-58. The inventive techniques of the '039 patent allow the average number of words loaded per original iteration to be reduced, for example, in some embodiments, from eight (sixteen 32-bit loads) to four (eight 32-bit loads). *Id*. at 4:60-63.

**<u>The "Encrypted Communication Control Patent" ('769)</u>**

101. Plaintiffs incorporate by reference the preceding paragraphs of this Complaint.

102. The '769 Patent, entitled "System and Method for Controlling Data Communications Between a Server and a Client Device," was duly and lawfully issued on April 8, 2014. A true and correct copy of the '769 Patent is attached hereto as Exhibit 5. The application for the '769 Patent was filed on December 16, 2011, as Application No.13/327,891 ("the '891 Application"), and issued with twenty-three claims. The '891 Application claimed priority to U.S. Application No. 13/024,634, filed on February 10, 2011, and U.S. Application No. 11/346,255, filed on February 3, 2006. The named inventors of the '769 Patent are Dave Bajar, Philip Chi-Jim Luk, Michael Kenneth Brown, and Darrell Reginald May, who were researchers at BlackBerry Limited.

103. The '769 Patent has been in full force and effect since its issuance until its expiration on February 3, 2026. Malikie owns by assignment the entire right and title in and to the '769 Patent, including the right to seek damages for any infringement thereof.

104. The '769 Patent relates generally to "system and method for controlling data communications between a server and a client device." *See* Ex. 5, Title. As the patent explains, some devices receive data that may be pushed to them by a server. *Id*. at 1:27-28. For example, a system may comprise a central message server that receives messages addressed to a number of users. *Id*. at 1:28-31. The system may, for example, further comprise support components for

communications such as a message management server, which processes messages that are received at the central message server and pushes the messages to client devices operated by the users. *Id.* at 1:31-36. Generally, while messages may be stored on the central message server, the message management server may be used more specifically to control when, if, and how messages are to be sent to the client devices. *Id.* at 1:36-39. In this manner, messages may be forwarded to the client devices as they are received at the central message server, or in accordance with some other predefined schedule, or at some predefined interval, for example. *Id.* at 1:39-44.

105. Where a server, such as the message management server, is adapted to push message data or other data to a client device, in some known implementations, the data is transmitted to the device via a shared network infrastructure (e.g., the public Internet). *Id.* at 1:45-49. Such transmissions may be susceptible to interception and unauthorized access. *Id.* at 1:49-50. In order to protect the confidentiality of these transmissions, data may be encrypted at the server prior to transmission, to be subsequently decrypted after the data is received at the client device. *Id.* at 1:51-54. A key that is capable of decrypting encrypted data received from the server is usually stored on the client device. *Id.* at 1:54-56. The key is typically downloaded to the client device during a synchronization process with a desktop computer, or when the client device is initially made ready for use, for example. *Id.* at 1:56-59.

106. In the event that the key required to decrypt encrypted data received from the server is deleted, or becomes otherwise inaccessible, the received encrypted data cannot be decrypted until access to the key is restored. *Id.* at 1:60-63. Furthermore, the server, unaware that the key has been deleted from the client device or has become otherwise inaccessible, may continue to push encrypted data to the client device. *Id.* at 1:63-66. However, if, for example, the client device

has been configured to discard data that it cannot decrypt, some data transmitted by the server to the client device may be lost. *Id*. at 1:66-2:02.

107. The inventors of the ’769 Patent recognized this problem with prior art systems and proposed a new technique where stop data, which when processed by the server, indicates to the server that there is at least some encrypted data that has been received by the client device from the server which could not be decrypted using the second key (e.g., as may be the case when the second key has been deleted from a key store on the client device). *Id*. at 2:32-39. This stop data can be transmitted (e.g. by the client device) to the server. *Id*. at 2:39-40. Upon receiving the stop data, the server may, for example, withhold the transmission of data encrypted with the first key to the client device until the second key is restored on the client device. *Id*. at 2:40-43. Alternatively, for example, the server may retransmit certain data to the client device once the second key is restored on the client device or once a new set of keys for encoding and/or decoding data communications is provided to the server and client device. *Id*. at 2:43-47.

## JURISDICTION AND VENUE

108. Plaintiffs incorporate by reference the preceding paragraphs of this Complaint.

109. This civil action arises under the patent laws of the United States, 35 U.S.C. § 1 *et seq.*, including without limitation 35 U.S.C. §§ 271, 281, 283, 284, and 285. This is a patent infringement lawsuit over which this Court has subject matter jurisdiction under, *inter alia*, 28 U.S.C. §§ 1331, 1332, and 1338(a).

110. This District has general and specific personal jurisdiction over Defendant because, directly or through intermediaries, Defendant has committed acts within this District giving rise to this action; is present in and transacts and conducts business, directly and/or indirectly, in this

District and the State of Texas; and transacts and conducts business with residents of this District and the State of Texas.

111. Plaintiffs' causes of action arise, at least in part, from Defendant's contacts with and activities directed at the United States, the State of Texas, and this District. On information and belief, Defendant owns and operates the ViaBTC bitcoin mining pool, together with the ViaBTC website located at viabtc.com and the "ViaBTC — Crypto Mining Pool" mobile application, through which Defendant offers and provides bitcoin mining and related services to users located throughout the United States, including in the State of Texas and this District.[166] On information and belief, Defendant distributes its mobile application to users in the United States through the Apple App Store and Google Play, and identifies mining-industry partners located in the United States, including in Texas.[167]

112. On information and belief, Defendant maintains and operates mining-pool servers in the United States, to which miners located in the United States, including in the State of Texas and this District, connect to mine bitcoin through Defendant's pool. As set forth above, on information and belief, Defendant deploys its mining-pool servers and nodes on cloud infrastructure that includes regions located in the United States. On information and belief, Defendant deploys and operates those United States servers, and routes United States miners to them, in order to minimize the network latency between Defendant's pool and the miners it serves in the United States, because shares that arrive late are rejected as stale and generate no revenue

---

[166] https://apps.apple.com/us/app/viabtc-crypto-mining-pool/id1334584229; https://www.viabtc.com/en/ (ViaBTC provides mining services to over one million users in 150+ countries/regions through the ViaBTC pool, website, and mobile application).

[167] *See* https://apps.apple.com/us/app/viabtc-crypto-mining-pool/id1334584229 (United States App Store); https://play.google.com/store/apps/details?id=com.viabtc.pool; https://www.viabtc.com/en/companies (listing United States mining-industry partners, including "BITCRUISER … Texas, USA").

for Defendant or its miners.[168] Defendant thus performs the methods claimed in the Asserted Patents within the United States.

113. Defendant has infringed the Asserted Patents within this District and the State of Texas by making, using, selling, offering for sale, and/or importing or by having made, used, sold, offered for sale, and/or imported in or into this District and elsewhere in the State of Texas, products and services covered by claims in the Asserted Patents, including without limitation products that, when made or used, practice the claimed methods of the Asserted Patents. Defendant, directly and through intermediaries, has and continues to make, use, sell, offer for sale, import, ship, distribute, advertise, promote, and/or otherwise commercialize such infringing products and services in or into this District and the State of Texas. Defendant regularly conducts and solicits business in, engages in other persistent courses of conduct in, and/or derives substantial revenue from goods and services provided to residents of this District and the State of Texas.

114. This Court has personal jurisdiction over Defendant pursuant to TEX. CIV. PRAC. & REM. CODE § 17.041 et seq.

115. Venue is proper in this District under 28 U.S.C. § 1391(b) and (c). On information and belief, Defendant is a foreign corporation organized under the laws of Hong Kong and is not a resident of any judicial district within the United States. Under 28 U.S.C. § 1391(c)(3), "a defendant not resident in the United States may be sued in any judicial district, and the joinder of such a defendant shall be disregarded in determining where the action may be brought with respect to other defendants." Venue over Defendant is therefore proper in this District. *See In re HTC Corp.*, 889 F.3d 1349, 1356 (Fed. Cir. 2018).

---

[168] *See supra* ¶¶ 46-49.

## **FIRST CLAIM**

## **(Infringement of the ’827 Patent)**

116. Plaintiffs incorporate by reference the preceding paragraphs of this Complaint.

117. The ’827 Patent is generally directed to improved techniques for use in cryptographic algorithms, and, in particular, to methods and apparatuses for generating a public key of the signer of a digital signature by computing $Q=r^{-1}$ (sR-eG), where G comprises a generator of an elliptic curve group that includes a first elliptic curve point R and a second elliptic curve point Q.

118. ViaBTC has been on notice of the ’827 Patent and a specific factual basis for its infringement of the ’827 Patent since at least the filing of this Complaint.

119. Defendant has, under 35 U.S.C. § 271(a), directly infringed, literally and/or under the doctrine of equivalents, one or more claims, including without limitation at least claim 1 of the ’827 Patent, by having made, used, tested, sold, offered for sale, and/or imported hardware and/or software including devices and software that comply with the Bitcoin protocol (excluding any products licensed under the ’827 Patent), such as bitcoin mining equipment (including, for example, hardware and software for digital asset mining, including mining rigs, application-specific integrated circuits (ASICs), computers, nodes, miners, servers, and software applications) and wallets (including hardware and software that functions as a bitcoin wallet). An exemplary claim chart showing one way in which ViaBTC infringed claim 1 of the ’827 Patent is attached as Exhibit 6.

## **SECOND CLAIM**

## **(Infringement of the ’197 Patent)**

120. Plaintiffs incorporate by reference the preceding paragraphs of this Complaint.

121. The ’197 Patent is generally directed to improved computational techniques for use in cryptographic algorithms, and, in particular, to methods and apparatuses for generating a digital signature of a message, the digital signature having first and second signature components, where the first is based on a first coordinate of an elliptic curve point representing an ephemeral public key, and generating an indicator to identify which value of multiple values recoverable from the first signature component is the ephemeral public key.

122. ViaBTC has been on notice of the ’197 Patent and a specific factual basis for its infringement of the ’197 Patent since at least the filing of this Complaint.

123. ViaBTC has, under 35 U.S.C. § 271(a), directly infringed, literally and/or under the doctrine of equivalents, one or more claims, including without limitation at least claim 1 of the ’197 Patent, by having made, used, tested, sold, offered for sale, and/or imported hardware and/or software including devices and software that comply with the Bitcoin protocol (excluding any products licensed under the ’197 Patent), such as bitcoin mining equipment (including, for example, hardware and software for digital asset mining, including mining rigs, application-specific integrated circuits (ASICs), computers, nodes, miners, and software applications) and wallets (including hardware and software that functions as a bitcoin wallet). An exemplary claim chart concerning one way in which ViaBTC infringed claim 1 of the ’197 Patent is attached as Exhibit 7.

## THIRD CLAIM

## (Infringement of the ’286 Patent)

124. Plaintiffs incorporate by reference the preceding paragraphs of this Complaint.

125. The ’286 Patent is generally directed to systems and methods for reducing the computation and storage requirements for a Montgomery style reduction and, in particular, to

techniques for performing, on a cryptographic apparatus, a Montgomery-style reduction in a cryptographic operation that includes obtaining an operand for the cryptographic operation; computing a modified operand using a reduction value, instead of a modulus used in performing a standard Montgomery reduction, to perform a replacement of a least significant word of the operand, rather than per form a cancellation thereof, where the reduction value is a function of the modulus; and outputting the modified operand.

126. ViaBTC has been on notice of the ’286 Patent and a specific factual basis for its infringement of the ’286 Patent since at least the filing of this Complaint. On information and belief, Defendant has not taken any action to stop its infringement.

127. Defendant has, under 35 U.S.C. § 271(a), directly infringed, and continues to directly infringe, literally and/or under the doctrine of equivalents, one or more claims, including without limitation at least claim 1 of the ’286 Patent, by making, using, testing, selling, offering for sale, and/or importing hardware and/or software including devices and software that comply with the Bitcoin protocol (excluding any products licensed under the ’286 Patent), such as bitcoin mining equipment (including, for example, hardware and software for digital asset mining, including mining rigs, application-specific integrated circuits (ASICs), computers, nodes, miners, servers, and software applications) and wallets (including hardware and software that functions as a bitcoin wallet). An exemplary claim chart showing one way in which ViaBTC infringes claim 1 of the ’286 Patent is attached as Exhibit 8.

## FOURTH CLAIM

## (Infringement of the ’039 Patent)

128. Plaintiffs incorporate by reference the preceding paragraphs of this Complaint.

129. The ’039 Patent is generally directed to systems and methods for efficient implementations of hash algorithms on a computer processor, including techniques for utilizing a processor’s registers to efficiently perform multiple iterations of SHA-2 family secure hash algorithms and, in particular, to techniques for maximizing a number of registers at an end of an iteration of a hash algorithm for use in a next iteration, where the method includes categorizing and unrolling iterations of an original secure hash algorithm into even iterations and odd iterations, reversing a sequence of computations in the even iterations to those in the odd iterations, said reversing resulting in an average number of words that need to be loaded into the registers per iteration being reduced by at least one half compared to the original secure hash algorithm, and combining an even iteration and an odd iteration to provide a new iteration of a loop.

130. ViaBTC has been on notice of the ’039 Patent and a specific factual basis for its infringement of the ’039 Patent since at least the filing of this Complaint. On information and belief, Defendant has not taken any action to stop its infringement.

131. Defendant has, under 35 U.S.C. § 271(b), induced and continues to induce infringement of at least claim 1 of the ’039 Patent. On information and belief, the pool members that mine on the ViaBTC pool operate mining machines in the United States that perform each step of the method claimed in the ’039 Patent when they compute the SHA-256 hashes required to mine, and those members thereby directly infringe, literally and/or under the doctrine of equivalents (excluding any products licensed under the ’039 Patent). An exemplary claim chart showing one way in which claim 1 of the ’039 Patent is infringed is attached as Exhibit 9.

132. ViaBTC knowingly induces that infringement. ViaBTC has been on notice of the ’039 Patent and a specific factual basis for infringement since at least the filing of this Complaint, and, on information and belief, has taken no action to stop it. ViaBTC nevertheless specifically

intends and encourages its members' infringing use. ViaBTC holds itself out as providing "a complete mining service, including mining machine access, miner management, profit viewing, and profit withdrawal," states that it has "prepared mining guides for beginners to help you understand the mining steps," instructs its users to "[b]uy mining machines," and directs them to "[f]ollow the mining tutorials for each coin to set up the Mining Configuration URL, username, and password" by which those machines are connected to ViaBTC's mining-pool servers and begin hashing.[169] ViaBTC publishes the pool URLs and ports through which those machines connect,[170] operates the stratum servers that assign each member the work its machines hash, monitors the resulting hashrate, and pays its members for the hashrate they contribute through its PPS+, PPLNS, and SOLO payout methods.[171]

## **FIFTH CLAIM**

## **(Infringement of the '769 Patent)**

133. Plaintiffs incorporate by reference the preceding paragraphs of this Complaint.

134. The '769 Patent is generally directed to a system and method for controlling encrypted data communications between a server and a client device. Ex. 5, Title. Claim 13, for example, recites a method of controlling data communications between a server and a client device. The method involves encrypting data using a first key, wherein the encrypted data is decryptable using a second key stored on a client device. The method further involves transmitting the encrypted data from the server to the client device. The method further involves receiving stop

---

[169] https://support.viabtc.com/hc/en-us/articles/7207443757967-Start-Mining.

[170] *See* https://support.viabtc.com/hc/en-us/articles/14367481714191-Mining-Pools-Information.

[171] https://www.viabtc.com/en/; *see* https://support.viabtc.com/hc/en-us/articles/7207443757967-Start-Mining ("ViaBTC supports self-configurable PPS+, PPLNS payment methods for all coins"; "ViaBTC supports real-time hashrate monitoring, hashrate alerts, miner group management").

data from the client device, wherein the stop data represents a command to the server, and wherein the stop data is pre-encoded using a cryptographic operation. The method further involves based on the stop data, determining, using a processor of the server, that the encrypted data was not decrypted using the second key by the client device, and ceasing transmission of data encrypted with the first key to the client device. Ex. 5, 18:8-24.

135. ViaBTC has been on notice of the '769 Patent and a specific factual basis for its infringement of the '769 Patent since at least the filing of this Complaint.

136. Defendant has, under 35 U.S.C. § 271(a), directly infringed literally and/or under the doctrine of equivalents, one or more claims, including without limitation at least claim 13 of the '769 Patent, by having made, used, tested, sold, offered for sale, and/or imported hardware and/or software (excluding any products licensed under the '769 Patent), including Defendant's mining-pool servers, stratum servers, nodes, computers, and software applications that establish and secure communication links with the miners and other devices that connect to the ViaBTC pool. As set forth above, Defendant performs the claimed method on mining-pool servers located in the United States. An exemplary claim chart showing one way in which ViaBTC infringed claim 13 of the '769 Patent is attached as Exhibit 10.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment against Defendant as follows:

A. That Defendant has infringed the Asserted Patents, and that Defendant has infringed and will continue to infringe the '286 Patent and '039 Patent unless enjoined;

B. That Defendant pay Plaintiffs damages adequate to compensate for its past infringement of each of the Asserted Patents as appropriate, and present and future infringement

of the ’286 Patent and ’039 Patent as appropriate, together with interest and costs under 35 U.S.C. § 284;

C. That Defendant pay prejudgment and post-judgment interest on the damages assessed;

D. That Defendant pay Plaintiffs enhanced damages pursuant to 35 U.S.C. § 284;

E. That Defendant be enjoined from infringing the ’286 Patent and ’039 Patent as appropriate or, if its infringement is not enjoined, that it be ordered to pay ongoing royalties to Plaintiffs for any post-judgment infringement of the ’286 Patent and ’039 Patent as appropriate;

F. That this is an exceptional case under 35 U.S.C. § 285, and that Defendant pay Plaintiffs’ attorneys’ fees and costs in this action; and

G. That Plaintiffs be awarded such other and further relief, including equitable relief, as this Court deems just and proper.

**DEMAND FOR JURY TRIAL**

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs hereby demands a trial by jury on all issues triable to a jury.

Dated: September 9, 2026

Respectfully submitted,

*/s/ Khue v. Hoang*
Khue V. Hoang
NY Bar No. 4131850
**Reichman Jorgensen Lehman & Feldberg LLP**
650 Fifth Avenue, Suite 2320
New York, NY 10019
Tel: (212) 381-1965
Fax: (650) 560-3501
khoang@reichmanjorgensen.com

Matthew G. Berkowitz
CA Bar No. 310426
Michael Polka
NY Bar No. 5494463
Michael Caulkins
CA Bar No. 340087
**Reichman Jorgensen Lehman & Feldberg LLP**
100 Marine Parkway, Suite 300
Redwood Shores, CA 94065
Tel: (650) 623-1401
Fax: (650) 560-3501
mberkowitz@reichmanjorgensen.com
mpolka@reichmanjorgensen.com
mcaulkins@reichmanjorgensen.com

Philip J. Eklem
VA Bar No. 92895
**Reichman Jorgensen Lehman & Feldberg LLP**
1909 K Street, NW, Suite 800
Washington, DC 20006
Tel: (202) 894-7310
Fax: (650) 560-3501
peklem@reichmanjorgensen.com

Vivek P. Shankam
IN Bar No. 39856-29
**Reichman Jorgensen Lehman & Feldberg LLP**
901 S. MoPac Expressway, Bldg. 1, Suite 270
Austin, TX 78746
Tel: (737) 227-3117
Fax: (650) 560-3501
vshankam@reichmanjorgensen.com

*Of Counsel*:

Mark D. Siegmund
Texas Bar No. 24117055
**Cherry Johnson Siegmund James, PC**
7901 Fish Pond Rd., 2nd Floor
Waco, TX 76710
Telephone: (254) 732-2242
Facsimile: (866) 627-3509
Email: msiegmund@cjsjlaw.com

William D. Ellerman
Texas Bar No. 24007151
**Cherry Johnson Siegmund James, PC**
One Glen Lakes Tower
8140 Walnut Hill Lane, Suite 105
Dallas, Texas 75231
Tel: (254) 732-2242
Facsimile: (866) 627-3509
wellerman@cjsjlaw.com

*Attorneys for Plaintiffs Malikie Innovations Ltd. and Key Patent Innovations Ltd.*